10-2740-cr
United States v. Moore

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2011

(Argued: November 17, 2011      Decided: February 22, 2012)

Docket No. 10-2740-cr

- - - - - - - - - - - - - - - - - - - -x

United States,

>                Appellee,

>          - v.-

Chauncey Moore,

>                Defendant-Appellant.

- - - - - - - - - - - - - - - - - - - -x

        Before:        JACOBS, Chief Judge, CABRANES and
                       LIVINGSTON, Circuit Judges.

Chauncey Moore appeals from a judgment entered in the United States District Court for the District of Connecticut (Chatigny, J.) on a plea of possession of a firearm by a felon. The plea was conditioned on the ability to appeal the district court's decision on his motion to suppress. After his arrest, Moore inculpated himself when he was questioned by police before he received Miranda warnings and again later, after he was warned. Moore contends that the

subsequent confession must be suppressed because it was obtained through a two-part interrogation technique outlawed as a violation of the Fifth Amendment in <u>Missouri v. Seibert</u>, 542 U.S. 600 (2004).

The district court declined to suppress the subsequent confession, and Moore appeals from that ruling. We conclude that the subsequent confession was given voluntarily and without coercion, and was not elicited by the proscribed two-step technique.

Moore also contends that the second interview violated his Sixth Amendment right to counsel. We conclude that the confession did not offend the Sixth Amendment because his right to counsel had not yet attached, particularly with regard to the federal offense for which he was prosecuted below.

Affirmed.

Jeremiah Donovan, Old Saybrook, CT, <u>for Appellant</u>.

Sandra S. Glover, Assistant United States Attorney (Robert M. Spector, Assistant United States Attorney, <u>on the brief</u>), District of Connecticut, <u>for</u> David B. Fein, United States Attorney, District of Connecticut <u>for Appellee</u>.

DENNIS JACOBS, Chief Judge:

Chauncey Moore appeals from a judgment entered in the United States District Court for the District of Connecticut (Chatigny, J.) on a plea of possession of a firearm by a felon. The plea was conditioned on his appeal of the district court's decision denying (in relevant part) his motion to suppress.

While fleeing arrest on a warrant, Moore tossed a gun away. During an exchange in the police station lockup after his arrest but before he received Miranda warnings, he told a law-enforcement officer where he had tossed the gun. A few hours later he confessed to other officers after the warnings were administered. Moore contends that he confessed because of a two-part interrogation technique outlawed as a violation of the Fifth Amendment in Missouri v. Seibert, 542 U.S. 600 (2004).

The district court suppressed the statement made in lockup -- a ruling from which the Government takes no appeal -- but declined to suppress the confession. Moore takes this appeal from that ruling. We conclude that the confession was given voluntarily, without coercion, and without violation of Seibert.

Moore also contends that the second interview violated his Sixth Amendment right to counsel because his right to counsel had attached prior to being questioned.  We conclude that the confession did not offend the Sixth Amendment because the right to counsel had not attached, in particular with regard to the federal offense for which he was prosecuted below.

Affirmed.

**BACKGROUND**

On the afternoon of September 23, 2002, a Connecticut Superior Court judge issued an arrest warrant for Chauncey Moore on charges that arose from a carjacking and attempted armed robbery in which shots were fired.  After 11 p.m. that night, Officer Mark R. Suda spotted Moore walking down the street in Norwalk, and gave chase.  After Suda lost sight of him, Moore tossed a handgun onto the roof of a house.  Suda searched the path of Moore's flight after giving up the chase, but found nothing.

Moore was apprehended the following morning, around 6:15 a.m., and placed in the lockup.  The arresting officers did not question him and did not administer Miranda warnings.

4

At 8:30 a.m., Detectives Arthur Weisgerber and Michael Murray were sent to the lockup to interview Moore, who was asleep.  They tried to awaken him, but Moore told them he did not know why he had been arrested and went back to sleep.  The detectives left.

Officer William Zavodjancik was in charge of the lockup that day.  Generally, arrestees placed in the lockup by 7:00 a.m. on a weekday (like Moore) would be processed and taken to the court the same morning.  At 9:15 a.m., Zavodjancik took several arrestees to court for arraignment, but Moore was not among them because Zavodjancik lacked the information necessary to "process" him prior to arraignment.[1]  The district court concluded "[o]n the record before [it], . . . [that] Officer Zavodjancik engaged in no deliberate wrongdoing as alleged by [Moore]."  Moore, 2007 WL 708789, at *2.  (Moore does not challenge this factual finding.[2])

---

[1] In order to "process" an arrestee, the precinct would, inter alia, "generate a computerized report containing . . . [a] statement of the pending charges." United States v. Moore, No. 3:03-CR-178 (RNC), 2007 WL 708789, *2 (D. Conn. Feb. 20, 2007).

[2] When Zavodjancik returned to the lockup at about 10:00 a.m., he found a file on his desk containing the information he needed to process Moore.  The file had not been there before.  Zavodjancik then processed Moore, although he made no attempt to take him to court then or

5

Just after noon, during one of Zavodjancik's routine checks on prisoners in the lockup, Moore asked to speak with a detective. Zavodjancik could not reach anyone in the detectives' bureau, and left a message. During the next check, Moore asked again to speak with a detective; Zavodjancik called again and left another message.

Around 2 p.m., Moore asked to use a pay phone and was moved to a cell with a phone. Half an hour later, while still in that cell, Moore spotted a Norwalk narcotics officer he knew (Sergeant Ronald Pine), and called him over. Pine was not involved in Moore's case and did not know that Moore was in the lockup until he heard Moore call his name. All Pine knew about Moore's arrest was that there had been an incident in which shots were fired and that the gun had not yet been recovered.

When Moore called to him, Pine came over and asked "What's up?" Moore asked Pine to help him get released on a

later that day. Accordingly, Moore was not arraigned until the next day.

Moore contended below that Zavodjancik purposefully failed to have him arraigned in violation of the directive in the arrest warrant that Moore was to be brought to court "without undue delay." Moore, 2007 WL 708789, at *2 (quotation marks omitted). The district court found "no evidence" that anyone asked Zavodjancik to refrain from taking Moore to court, "nor any evidence" suggesting that Zavodjancik "would engage in such a subterfuge." Id.

promise to appear, as Pine had done once before (on a larceny charge). Pine said he could not help because the pending charges involved discharge of a firearm.

Pine then asked Moore if he could tell him where the gun was, and Moore said he was reluctant to answer because he did not want to face a federal gun charge. Pine offered to put in a good word for him with the state's attorney. During this brief exchange, Pine saw Agent Ron Campanell of the Federal Bureau of Alcohol, Tobacco, Firearms, and Explosives (who was there on an unrelated matter), and asked him to join them. Pine told Moore that he could talk to Campanell after Moore helped them find the gun.

Moore agreed, told them where he had tossed the gun, and drew a map. Map in hand, Pine and Campanell drove to 75 South Main Street where, from the rear of the property, they could see the gun on the roof of the house. Detectives Weisgerber and Murray arrived and photographed the scene before retrieving the gun. Pine then informed the detectives that Moore wanted to talk to them.

Just after 4:00 p.m. -- about one hour and 35 minutes after Pine and Moore began talking -- the detectives arrived at Moore's cell. Moore told them that he was willing to talk about the pending charges. They moved him to a nearby interview room, where they were joined by Campanell.

The detectives told Moore that he was in serious trouble; but before they began asking questions, they handed him an advice of rights and waiver form. By this point, Moore had decided it was in his best interest to cooperate. He read the form aloud, initialed each paragraph, and signed on the bottom.

Over the next 45 minutes, the detectives asked him where he got the gun; who else in Norwalk possessed a gun; whether he had information about several cold homicide cases; and what he knew about the carjacking and attempted robbery for which he had been arrested. Moore gave evasive answers to the first two inquiries. He did disclose his role in the carjacking and attempted robbery, but refused to provide a written statement without speaking to counsel. The detectives ended the interview.

The following day (September 25, 2002), Moore was arraigned on the state charges. Later, the United States Attorney obtained an indictment against Moore on the federal charge of being a felon in possession of a firearm. See 18 U.S.C. § 922(g).

In the federal criminal case, Moore moved to suppress his statements to investigators (and the gun) on the grounds

that he was not advised of his <u>Miranda</u> warnings and that his questioning violated his Sixth Amendment right to counsel, which he argues attached when the state prosecutor filed an information along with the application for an arrest warrant. The district court suppressed the initial, unwarned statement Moore provided to Pine and Campanell while in the lockup. The district court did not suppress the gun as a fruit of the unwarned statement, however, because the gun was physical evidence obtained from a voluntary statement. <u>Moore</u>, 2007 WL 708789, at *5 n.5 (citing <u>United States v. Patane</u>, 542 U.S. 630 (2004)). The district court also denied the motion to suppress the later, warned statement.

Moore subsequently entered a conditional guilty plea that permitted him to take this appeal. Moore was sentenced principally to 110 months' incarceration and three years of supervised release.

**DISCUSSION**

When reviewing a district court's decision in the government's favor on a motion to suppress, this Court "examine[s] the record in the light most favorable to the

9

government."  United States v. Rommy, 506 F.3d 108, 131 (2d Cir. 2007).  We "review a district court's determination regarding the constitutionality of a Miranda waiver de novo," and its factual findings for "clear error."  United States v. Carter, 489 F.3d 528, 534 (2d Cir. 2007).

**I.**

**A.**

The district court suppressed Moore's initial, unwarned statement as obtained in violation of his Fifth Amendment rights under Miranda v. Arizona, 384 U.S. 436 (1966), but did not suppress Moore's post-warning statement.  Because the government does not appeal the suppression of Moore's initial statement, the only issue before us is whether the district court erred in not suppressing Moore's subsequent confession, provided after he was Mirandized.

Moore argues that police improperly engaged in a deliberate two-step interrogation technique designed to subvert his Fifth Amendment rights by getting him to incriminate himself before being advised of his rights, then reading him his rights and getting him to incriminate himself again while still disarmed by the original

10

incrimination. Under these circumstances, Moore argues, both the initial, unwarned statement and the later, post-warning statement must be suppressed.

The Supreme Court has twice considered whether a post-warning inculpatory statement must be suppressed if the defendant was previously interrogated without being warned. First, in Oregon v. Elstad, 470 U.S. 298 (1985), police executed a warrant for the arrest of the 18-year old Elstad on a burglary charge. Id. at 300. At his house, Elstad's mother allowed the police to go upstairs, where they arrested her son. Id. As the police were removing him from the home, they took his mother aside to explain the situation. Id. at 300-01. In that interval, an officer questioned Elstad without advising him of his Miranda rights, and Elstad implicated himself. Id. at 301. Later, at the police station, Elstad was "Mirandized" and interrogated, and gave a complete confession. Id. at 301-02. Elstad argued for suppression of the warned confession on the ground that the initial statement "let the cat out of the bag" and "tainted" his subsequent confession. Id. at 303-04 (internal quotation marks omitted).

11

"Though Miranda requires that the unwarned admission must be suppressed," the Supreme Court ruled that "the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." Id. at 309. The "subsequent administration of Miranda warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement," because "the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights." Id. at 314. "[T]here is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of Miranda, was voluntary." Id. at 318. "The relevant inquiry" is whether "the second [post-warning] statement was . . . voluntarily made." Id.

Elstad involved an accidental or mistaken interrogation in violation of Miranda. See Elstad, 470 U.S. at 314 (explaining that the police did not use "deliberately coercive or improper tactics" to obtain the initial, unwarned statement). In Missouri v. Seibert, 542 U.S. 600 (2004), the Court considered a deliberate effort to

12

circumvent <u>Miranda</u>.  In <u>Seibert</u>, the police interrogated a woman suspected of arson.  In the first interview, the police intentionally refrained from advise her of her rights, and elicited all the information they needed.  They then warned her, and again interrogated her using the first statements against her to obtain a post-warning confession. <u>Id.</u> at 604-06.  Five justices found that this tactic violated the suspect's Fifth Amendment rights even with regard to the statement given post-warning.

The justices split as to the proper test.  The plurality (Souter, Stevens, Ginsburg, and Breyer, <u>JJ.</u>) concluded that the warning administered prior to the second statement was ineffective, <u>id.</u> at 611-12, distinguishing <u>Elstad</u> on that basis.  <u>Id.</u> at 615.  Five factors were said to be relevant to that inquiry: (1) "the completeness and detail of the questions and answers in the first round of interrogation," (2) "the overlapping content of the two statements," (3) "the timing and setting of the first and second" interrogations, (4) "the continuity of police personnel" doing the questioning, and (5) "the degree to which the interrogator's questions treated the second round as continuous with the first."  <u>Id.</u>  The warning was deemed

ineffective because: the original "questioning was systematic, exhaustive, and managed with psychological skill"; there "was little, if anything, of incriminating potential left unsaid"; the two interrogations took place "only 15 or 20 minutes" apart, "in the same place," and with "the same officer"; nothing was said to dispel the impression that the first statement could be used against the suspect; and it reasonably appeared to the suspect that "the further questioning was a mere continuation of the earlier questions and responses." Id. at 616.

Justice Kennedy's concurrence disagreed with the plurality's reasoning. In Justice Kennedy's view, the real difference between Elstad and Seibert was that Seibert involved a "deliberate, two-step strategy, predicated upon violating Miranda." Id. at 621 (Kennedy, J., concurring). It was decisive for Justice Kennedy that the two-step process was arranged by the police deliberately as a "calculated way to undermine the Miranda warning" -- something that is only likely to occur "in the infrequent case." Id. at 622. So, in Justice Kennedy's view, if there is a deliberate two-step, the "postwarning statements that are related to the substance of prewarning statements must

14

be excluded unless curative measures are taken before the postwarning statement is made." Id. Such "curative measures" are those "designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the Miranda warning and of the Miranda waiver." Id. Such curative measures could include "a substantial break in time and circumstances between the prewarning statement and the Miranda warning" or "an additional warning that explains the likely inadmissibility of the prewarning custodial statement." Id.

This Court first addressed the issue of a two-step interrogation in United States v. Carter, where we implicitly found controlling Justice Kennedy's concurrence in Seibert and "join[ed] our sister circuits in holding that Seibert lays out an exception to Elstad for cases in which a deliberate, two-step strategy was used by law enforcement to obtain the postwarning confession." United States v. Carter, 489 F.3d 528, 536 (2d Cir. 2007). In Carter, officers executing a search warrant smelled crack cocaine and discovered a bag containing crack and powder cocaine as well as a brown substance they believed to be heroin. The suspect (Bearam), unwarned, said that the substance was "bad

15

co[caine]." Id. at 533. Bearam was interrogated again after being Mirandized, and admitted that he sold drugs and had received the bag of drugs discovered by the authorities. Id.

The facts in Carter did not amount to a proscribed two-step strategy because (1) "there was almost no overlap between th[e] statement and the full confession [Bearam] gave after he received the warnings," (2) over an hour had passed between the two statements, (3) the investigators were not the same in the first and second interviews, (4) the investigators in the second interview did not know about Bearam's original statement, and (5), unlike in Seibert where "the second round of interrogation was essentially a cross-examination using information gained during the first round of interrogation," in Carter the "postwarning questioning was not a continuation of the prewarning questioning." Id. Finally, having found no deliberate two-step we applied the principle of Justice Kennedy's Seibert concurrence and concluded that Bearam waived his rights: his initial, prewarning statement was "voluntary"; the questioning "not coercive"; and the later, post-warning statement was, therefore, admissible. Id. at 537.

16

We considered this issue again in United States v. Capers, 627 F.3d 470 (2d Cir. 2010). Capers was caught in a sting operation stealing money from Express Mail envelopes. Id. at 472-73. After Capers and another man (Lopez) were arrested and separated, Capers was questioned by a postal inspector without being warned, and incriminated himself. Id. After Capers was transported to another facility and advised of his rights, he was again interviewed by the same postal inspector, and again incriminated himself. Id. at 473. We affirmed the suppression of both sets of statements. Id. at 474, 485.

In affirming the suppression, we decided several questions left open by Seibert and Carter, that will bear upon our analysis here. First, we made explicit what was implicit in Carter: Justice Kennedy's concurrence in Seibert is controlling. Capers, 627 at 476. Second, although Justice Kennedy wrote of a deliberate two-step scheme, his concurrence did not explain how a court is to determine whether such a strategy has been employed. So, "we join[ed] our sister circuits in concluding that a court should review the totality of the objective and subjective evidence surrounding the interrogations in order to determine

17

deliberateness . . . ." Id. at 479. Third, we held that the prosecution bears the burden of disproving by a preponderance of the evidence that the government employed a deliberate two-step strategy to deprive the defendant of the protections afforded by the Fifth Amendment. Id. at 479-80.

Finally, we advised a somewhat closer scrutiny of an investigator's testimony of subjective intent when the proffered rationale is not a "legitimate" reason to delay or where it "inherently lacks credibility" in view of the "totality of the circumstances." Capers, 627 F.3d at 484 n.5. Such scrutiny is not ordinarily required when the reason for delay is legitimate, such as officer or community safety or when delay is a product of a "rookie mistake," miscommunication, or "a momentary lapse in judgment." Id. Moreover, if it is found, after weighing the investigator's credibility, that the investigator's intent was not "calculated . . . to undermine Miranda," delay will not require exclusion of the later, warned statement even if the court finds that the delay was for an illegitimate reason and even in the absence of curative measures. Id. at 482.

18

**B.**

These authorities can be applied using a straightforward analysis. First, was the initial statement, though voluntary, obtained in violation of the defendant's <u>Miranda</u> rights? If not, there is no need to go further. <u>See</u> <u>United States v. Courtney</u>, 463 F.3d 333, 336 (5th Cir. 2006). If the initial statement *was* obtained in violation of the defendant's <u>Miranda</u> rights, has the government demonstrated by a preponderance of the evidence, and in light of the totality of the objective and subjective evidence, that it did *not* engage in a deliberate two-step process calculated to undermine the defendant's <u>Miranda</u> rights? If so, the defendant's post-warning statement is admissible so long as it, too, was voluntary; if not, the post-warning statement must be suppressed unless curative measures (designed to ensure that a reasonable person in the defendant's position would understand the import and effect of the <u>Miranda</u> warnings and waiver) were taken before the defendant's post-warning statement.

The district court concluded that Moore's initial statement was obtained in violation of his <u>Miranda</u> rights. The government does not appeal that decision; so we proceed on that assumption.

In considering whether the government has demonstrated that it did not engage in a deliberate two-step process designed to thwart Moore's <u>Miranda</u> rights, we "review the totality of the objective and subjective evidence surrounding the interrogations," <u>Capers</u>, 627 F.3d at 479, guided by -- but not limited to -- the factors identified by the plurality in <u>Seibert</u>, <u>see</u> <u>Capers</u>, 627 F.3d at 483-84 (applying plurality's factors); <u>see also</u> <u>Seibert</u>, 542 U.S. at 615 (identifying factors). Although the five <u>Seibert</u> factors were developed by the plurality to gauge whether the later <u>Miranda</u> warnings "could be effective enough to accomplish their object," <u>Seibert</u>, 542 U.S. at 515, they likewise will often serve as helpful indicia for whether an alleged two-step interrogation was intended to circumvent <u>Miranda</u>, <u>see, e.g.</u>, <u>Capers</u>, 627 F.3d at 483-84; <u>Carter</u>, 489 F.3d at 536. We therefore use the plurality's five factors not to weigh the effectiveness of the later <u>Miranda</u>

warnings, but to shed light on the detectives' intent.[3]

A review of the evidence leads us to conclude that the government did not engage in a deliberate two-step strategy to deprive Moore of his Miranda rights. There is no subjective evidence of intent here -- no testimony, for example, by any officer of an intent to use a two-step technique, nor any evidence that such intent was reflected in a police report. See, e.g., Capers, 627 F.3d at 479 (categorizing the interrogating officer's testimony as subjective evidence); cf. Ryan Iron Works, Inc. v. NLRB, 257 F.3d 1, 9 (1st Cir. 2001) (observing that subjective criteria includes a party's "own characterization of [its] motive") (internal quotation marks omitted). Nor is there any objective evidence that such a technique was used. Moore, 2007 WL 708789, at *2 (finding "no evidence" that the government intentionally delayed bringing Moore to court or engaged in any such subterfuge or deliberate wrongdoing in order to obtain a confession).

---

[3] The five Seibert factors consulted in this particular case "are by no means the only factors to be considered. . . . [Instead,] a court should review the totality of the objective and subjective evidence surrounding the interrogations in order to determine deliberateness." See Capers, 627 F.3d at 479. Subjective evidence of the investigators' intent, if credible, will of course be persuasive, and often decisive.

Moreover, a discarded gun obviously poses public safety considerations. True, the district court ruled that the public safety exception[4] did not, as a matter of law, excuse the failure to give <u>Miranda</u> warnings at the initial interview, <u>see</u> <u>Moore</u>, 2007 WL 708789, at *5 -- a ruling we do not consider, much less adopt, inasmuch as it was unchallenged by the government on appeal. Nevertheless, undoubted public safety considerations plausibly account for the conduct of the police in a way that militates against finding that the first interview was a premeditated attempt to *evade* <u>Miranda</u>. <u>See generally</u> <u>Capers</u>, 627 F.3d at 481; <u>id.</u> at 492-94 (Trager, <u>J.</u>, dissenting); <u>cf.</u> <u>United States v. Hernandez-Hernandez</u>, 384 F.3d 562, 566 (8th Cir. 2004) (finding that the failure of the officer to read the defendant "his rights does not seem to have been 'an intentional withholding that was part of a larger nefarious plot.'" (quoting <u>Reinert v. Larkins</u>, 379 F.3d 76, 91 (3d Cir. 2004))).[5]

---

[4] <u>See, e.g.</u>, <u>New York v. Quarles</u>, 467 U.S. 649, 659 (1984).

[5] The District Court's holding rested on a lack of exigent circumstances, not on any adverse credibility finding regarding the testimony of Sergeant Pine. <u>Moore</u>, 2007 WL 708789, at *2-3, *5; <u>see</u> <u>Capers</u>, 627 F.3d at 481, 484 n.5. Although Pine's stated public safety rationale was

The objective evidence -- including the narrowness of overlap between the subjects of the two interrogations, the participation of different officers, and the elapse of 90 minutes between the interrogations -- decidedly points against concluding that the government engaged in a deliberate two-step process designed to undermine Moore's Fifth Amendment rights.

1. Thoroughness of the first interrogation. The first factor considers "the completeness and detail of the questions and answers in the first round of interrogation." Seibert, 542 U.S. at 615. As opposed to Seibert -- where the initial "questioning was systematic, exhaustive, . . . managed with psychological skill," and left "little, if anything, of incriminating potential . . . unsaid," id. at 616 -- here the initial questioning was brief and spare. Sergeant Pine's questioning of Moore in the lockup was limited to the location of the gun because, as the

---

insufficient to render Moore's first statement admissible under the public safety exception to Miranda, it *was* sufficient, "in light of the totality of the circumstances," Capers, 627 F.3d at 484 n.5, to show that Pine did not intend to circumvent Miranda with this unwarned questioning. Under Capers, therefore -- even in the absence of one of the recognized "legitimate" reasons for delaying Miranda warnings, id. -- Pine's rationale does not bar admission of the second warned, statement, regardless of whether curative measures were undertaken.

23

government argued, Pine was worried about the danger to the public of someone finding a (potentially loaded) weapon. Pine asked no questions about Moore's involvement in the attempted robbery or carjacking, about who else was involved in either of those incidents, or about how Moore obtained the gun. Pine's sole and limited focus was finding the gun. See United States v. Verdugo, 617 F.3d 565, 575 (1st Cir. 2010) (finding it significant that the defendant "was asked only a limited number of questions before he was read his Miranda rights").

2. Overlap. The second factor -- "the overlapping content of the two statements," Seibert, 542 U.S. at 615 -- also favors the government. See United States v. Stewart, 536 F.3d 714, 722 (7th Cir. 2008) ("[T]he lack of overlap between the warned and unwarned statements is evidence that the interrogator did not deliberately use a two-step strategy designed to circumvent Miranda."). Whereas the initial questioning focused exclusively on the location of the gun, the second questioning was broad and systematic: it focused on the attempted robbery and carjacking, where Moore got the gun, who else in town had guns, and whether Moore had any information about cold homicide cases. The two

rounds of questioning did not appreciably overlap. See Carter, 489 F.3d at 536 (finding "almost no overlap" between the initial questioning involving the contents of a baggie found during the search and the defendant's later full confession); see also United States v. Jackson, 608 F.3d 100, 104 (1st Cir. 2010) (finding significant that the initial questioning was "aimed primarily at securing the weapon").

3. Timing and setting. The circumstances of the interrogations likewise favor the government. Although both rounds of questioning took place within the police station, the first began when Moore initiated a conversation with Pine after he saw Pine walking through the station and called him over to speak with him. Moore did so because he knew Pine, who had previously helped Moore get released on a promise to appear, and wanted to ask Pine to help him again. Although (as the district court found) Pine turned the discussion to the whereabouts of the gun, Moore, 2007 WL 708789, at *3, Pine was not involved in the investigation of Moore, id. at *2, and Pine did not know that Moore was in the lockup before Moore beckoned to him. Id. In combination, these facts suggest that, although Pine

25

questioned Moore about the location of the gun and the district court suppressed Moore's response, Pine did not initiate this questioning as part of a two-step interrogation.[6]

4. Continuity of personnel. There was little "continuity of police personnel" involved in the two interviews. See Seibert, 542 U.S. at 615. In Seibert, the same officer did the questioning both times. Id. at 605, 616. Similarly, the lead postal investigator who set up the sting operation in Capers did the questioning before and then again after the defendant had been advised of his rights. 627 F.3d at 473, 483. Here, Moore was questioned first by Pine and later by Detectives Weisgerber and Murray. The detectives were not present at the initial questioning; and Pine was not present when the detectives asked the questions. Although Pine called over Agent Campanell during his brief interaction with Moore, and Campanell was also present at Moore's interrogation by the detectives, Campanell had little, if any, role in questioning Moore.

---

[6] Both interviews took place in the police station; but the environment was significantly different. Moore's encounter with Pine, which began as a voluntary conversation after Moore initiated contact, was not "inquisitorial," Capers, 627 F.3d at 483, while the second interview was routine and systematic.

26

5. Continuity of the questioning. Approximately 90 minutes elapsed between Pine's encounter with Moore and the detectives' interrogation of him. In that interval, the officers left the station to retrieve the gun. The 90-minute interval was enough time for Moore to have reasonably believed that the second interrogation was not merely a continuation of the first.

In Capers, a 90-minute break between questioning was insufficient. 627 F.3d at 484. But there, both encounters were inquisitorial and conducted by the same inspector, who was leading the investigation and had planned the sting operation. See id. at 483-84. Moreover, in Capers, "the latter session was 'essentially a cross-examination using information gained during the first round of interrogation.'" Id. at 484 (quoting Carter, 489 F.3d at 536). Here, the second interview was not treated as a continuation of the first, see Seibert, 542 U.S. at 615, nor did the investigators use the information obtained from Pine's questioning to cross-examine Moore or compel him to answer due to the weight of an earlier admission, id. at 621 (Kennedy, J., concurring).

Moore had a 90-minute break between the two encounters, which differed in every material respect.  The break in momentum allowed Moore to appreciate that he retained the right to remain silent.  See Seibert, 542 U.S. at 616-17; see also United States v. McConer, 530 F.3d 484, 498 (6th Cir. 2008) (describing a reasonable suspect's belief that he or she retained a choice to remain silent as "the factor primarily relied upon by the Seibert plurality").

Based on the totality of the record here, the government has met its burden of demonstrating that it did not engage in a deliberate two-step process to undermine Moore's Fifth Amendment rights.  Therefore, this case is controlled by Elstad, not Seibert.

Under Elstad, the dispositive inquiry is whether the statements were provided voluntarily and free of coercion.  470 U.S. at 318.  Moore does not contend -- nor could he -- that his initial statement to Pine was coerced or otherwise involuntary.[7]

_____

[7] This is so even though we "presume the privilege against compulsory self-incrimination ha[d] not been intelligently exercised" by Moore when he spoke to Pine because Moore had not been advised of his rights.  Elstad, 470 U.S. at 310.

Nor can there be doubt that Moore's later statement was voluntary. The circumstances of his questioning "contain no traces of the 'brutality, [p]sychological duress, threats, [or] unduly prolonged interrogation' that courts have previously found when they have concluded that statements were involuntarily made." Verdugo, 617 F.3d at 575 (quoting Jackson, 608 F.3d at 102-03) (alterations in original). Moore was advised of his rights before the later interrogation, and he agreed (orally and in writing) to waive them. There is no dispute that he was fully advised of his rights and that he knowingly and voluntarily waived them. See Elstad, 470 U.S. at 314-15; Carter, 489 F.3d at 536-37. Moore's willingness to talk with the police even after he was informed of his rights is itself "highly probative." Elstad, 470 U.S. at 318. Based on these facts, it is clear Moore knowingly and intelligently waived his right to remain silent. Because "[a] subsequent administration of Miranda warnings . . . ordinarily should suffice to remove the conditions that precluded admission of the earlier [unwarned] statement," id. at 314, and Moore's statements to the authorities were voluntary, the district court properly denied Moore's suppression motion as to Moore's post-warning statement to the detectives.

## II.

Moore's second argument for suppression -- that his post-arrest questioning violated his Sixth Amendment right to counsel -- fares no better. The Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The district court concluded that Moore's Sixth Amendment right had not yet attached because the state prosecution had not been initiated, and (independently) that the Sixth Amendment did not attach to the federal gun possession charge because the Sixth Amendment is offense specific and the gun-possession prosecution had not yet been initiated. We agree on both scores.

## A.

The Sixth Amendment is concerned with the assistance of counsel in "criminal prosecutions." U.S. Const. amend. VI. Accordingly, the right to counsel does not attach until the prosecution is initiated. If, as true at the time of Moore's questioning here, no formal charging instrument has yet been filed, the right to counsel generally attaches "at

30

the first appearance [by the accused] before a judicial officer at which a defendant is told of the formal accusation against him and restrictions are imposed on his liberty." Rothgery v. Gillespie Cnty., 554 U.S. 191, 194 (2008) (citing Michigan v. Jackson, 475 U.S. 625, 629 n.3 (1986), and Brewer v. Williams, 430 U.S. 387, 398-99 (1977)). Absent a formal charge, arrest on a warrant, even one issued pursuant to a criminal complaint sworn out by prosecutors, is insufficient prior to the initial appearance before a judicial officer. See United States v. Duvall, 537 F.2d 15, 21-22 (2d Cir. 1976) (Friendly, J.). It is only at that point that "the government has committed itself to prosecute" that "the adverse positions of government and defendant have solidified" and the accused "finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law." Rothgery, 554 U.S. at 198 (internal quotation marks omitted).

Moore was questioned before he was arraigned. He had been arrested the day after a state prosecutor presented an application for an arrest warrant (with attached criminal information) to a superior court judge. Once Moore was

31

arrested, he remained in lockup where he had the conversation with Pine and then was moved to an interrogation room (after the gun was located) and questioned by the detectives and Agent Campanell. Moore was then arraigned the following day.

Moore argues that the line of cases fixing the attachment of the Sixth Amendment at arraignment are inapplicable here because the police unnecessarily delayed bringing him to court. But, as the district court found as fact, there was no attempt by the police to intentionally keep Moore from being arraigned. Moore, 2007 WL 708789, at *2 (finding "no evidence" that anyone asked Officer Zavodjancik to refrain from taking Moore to court "nor any evidence" suggesting that Zavodjancik "would engage in such a subterfuge."). This finding is reviewed for clear error, Carter, 489 F.3d at 534, and Moore has failed to show error.

Moore also argues that the Sixth Amendment attached even before his arrest because the assistant state's attorney obtained the arrest warrant by presenting the superior court judge with an information and an application for an arrest warrant. But the Connecticut Supreme Court, in State v. Pierre, 890 A.2d 474 (Conn. 2006), held that an

32

information attached to an application for an arrest warrant does not represent a commitment to prosecute, id. at 506-508; rather, that commitment is made only when the state -- following the defendant's arrest -- files the information and arrest warrant with the court *at the defendant's arraignment*, id. at 508.

Moore attempts to distinguish Pierre by drawing a distinction between the "signing" of the information by prosecutors in Pierre, and the "filing" of that information with the court. But Pierre expressly stated that (as here) the arrest warrant application approved by the superior court included an attached information signed by a state's attorney. 890 A.2d at 504. Pierre held that "it was not until the entire arrest warrant, with the attached signed information, was filed with the court *at arraignment* that the document became an information within [S]ixth [A]mendment jurisprudence, thus triggering the defendant's constitutional right to counsel." Id. (emphasis added). Like the sworn complaint in Duvall and the information in Pierre, the information in this case initially "function[ed] . . . as a basis for an application for an arrest warrant," Duvall, 537 F.2d at 22 (internal quotation marks omitted) --

33

"a prelude to a criminal prosecution . . . rather than the initiation of an adversarial judicial proceeding in its own right," Pierre, 890 A.2d at 508.

The precedents of this Court cited by Moore are not to the contrary. In United States v. Mills, 412 F.3d 325, 328 (2d Cir. 2005), we *assumed* that the right to counsel attached before a defendant's first appearance before a judicial officer because, "[f]or the purposes of th[at] appeal, the government d[id] not challenge the District Court's determination that the police officers violated Mills's right to counsel as to the state charges" by interrogating him after he was charged but prior to his arraignment. Accord id. at 326.[8]

In United States v. Worjloh, 546 F.3d 104, 108 (2d Cir. 2008) (per curiam), the defendant also relied on Mills, and we made clear that such reliance was misplaced because Mills proceeded based on the government's concession.

Accordingly, Moore's Sixth Amendment right to counsel had not attached before he was interrogated, and the

---

[8] The district court's ruling was based on Connecticut precedents on this issue as they existed in 2004, prior to the state Supreme Court's decision in Pierre. See United States v. Mills, No. 03-32, 2004 WL 57282, at *2 (D. Conn. Jan. 8, 2004).

34

district court correctly denied his motion to suppress on that basis.

**B.**

Independently, Moore's argument fails because even if his right to counsel had attached to the state charges, it had not attached to the federal charge for which he pleaded guilty below.

"[T]he Sixth Amendment right is 'offense specific,'" meaning that even when the right to counsel attaches for one offense, that does not mean that the defendant has a right to counsel for all ongoing criminal investigations. Texas v. Cobb, 532 U.S. 162, 164 (2001) (quoting McNeil v. Wisconsin, 501 U.S. 171 (1991)). "[T]he definition of an 'offense,'" however, "is not necessarily limited to the four corners of a charging instrument." Id. at 173. Instead, "'where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.'" Id. (quoting Blockburger v. United

35

<u>States</u>, 284 U.S. 299, 304 (1932)).[9]

Moore was charged with (and pleaded guilty to) the federal crime of being a felon in possession of a firearm. The elements of such an offense are (1) that the defendant is a felon, (2) who possesses a firearm or ammunition, (3) which has been shipped or transported in interstate commerce. 18 U.S.C. § 922(g). Moore was charged with various state crimes including (1) two counts of attempt to commit felony murder; (2) two counts of criminal use of a firearm; (3) two counts of attempt to commit first degree robbery; (4) two counts of conspiracy to commit first degree robbery; (5) first degree reckless endangerment; (6) robbery involving an occupied motor vehicle; and (7) third degree assault. The only one of those offenses that even arguably overlaps with the federal charge is criminal use of a firearm under Conn. Gen. Stat. § 53a-216(a). The elements of that crime are (1) commission of a felony, (2) in which the defendant uses or threatens to use a firearm. <u>Id.</u> The

---

[9] <u>Blockburger</u> defined the term "offense" for the purposes of the Fifth Amendment's protection against double jeopardy. <u>Cobb</u> applied <u>Blockburger</u>'s definition in the right-to-counsel context under the Sixth Amendment. <u>Cobb</u>, 532 U.S. at 173 ("We see no constitutional difference between the meaning of the term 'offense' in the contexts of double jeopardy and of the right to counsel.").

federal charge has the added element that the defendant must be a felon, and one element of the state offense (that is missing from the federal statute) is that the defendant must use or threaten to use the firearm in the commission of a felony.  Accordingly, under Blockburger, they are separate offenses.

Moore argues the offenses are the same because Moore received an increased sentence because he "used or possessed a[] firearm . . . in connection with another felony offense . . . ."  U.S.S.G. § 2K2.1(b)(6).

According to Moore's brief, when the Guidelines are "an integral component of the federal charge . . . , the state statute can be seen as a lesser included offense of the federal statute[] since it requires proof that the defendant had used a firearm in committing a felony . . . ."  Moore does not explain, nor is it readily apparent, why the Guidelines should be considered an integral component of a federal offense.  Moreover, any such argument is refuted by the offense-specific, Sixth Amendment jurisprudence, which determines whether two offenses overlap based on the *elements* of the offenses and whether there are any *elements* present in one of the offenses but not the other.  See Cobb,

532 U.S. at 173; see also Blockburger, 284 U.S. at 304. Sentencing enhancements are separate from the offense and related conduct, which is why a defendant can receive an enhancement as to one offense based on particular conduct and then be prosecuted separately based on that same conduct.  See Witte v. United States, 515 U.S. 389, 399-404 (1995); United States v. Grisanti, 116 F.3d 984, 987-88 (2d Cir. 1997).

Because the Sixth Amendment is offense specific and the state and federal offenses charged against Moore are distinct offenses under the Sixth Amendment, Moore's Sixth Amendment right to counsel was not violated by his post-arrest questioning.  The district court therefore did not err in denying Moore's motion to suppress for the alleged violation of his Sixth Amendment right to counsel.

**CONCLUSION**

We have carefully considered all of Moore's remaining arguments and find them to be without merit.  Accordingly, the judgment of the district court is affirmed.