10-4324-pr
*Hawthorne v. Schneiderman*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

August Term, 2011

(Argued: June 13, 2012)                                      Decided: August 20, 2012)

Docket No. 10-4324-pr

_____

RUDOLPH HAWTHORNE,

*Petitioner-Appellant,*

v.

ERIC T. SCHNEIDERMAN,[1]

*Respondent-Appellee.*

_____

Before: CALABRESI, CABRANES, and LOHIER, *Circuit Judges.*

Petitioner-appellant Rudolph Hawthorne appeals from a December 9, 2010 judgment of the

United States District Court for the Eastern District of New York (Nina Gershon, *Judge*) denying his

petition for a writ of habeas corpus. Because the Appellate Division of the New York State Supreme

Court, Second Department, issued a reasonable decision on the merits of petitioner's claim, to which we

are required to defer, we affirm the judgment of the District Court.

Affirmed.

Judge Calabresi concurs in a separate opinion.

_____

[1] As instructed by Fed. R. App. P. 43(c)(2), we have substituted for former Attorney General Eliot Spitzer, a named official sued in his official capacity, the current Attorney General, Eric Schneiderman. The Clerk is directed to amend the official caption accordingly.

1

JULIA PAMELA HEIT, New York, NY, *for Petitioner-Appellant Rudolph Hawthorne.*

DANIEL BRESNAHAN, Assistant District Attorney (John M. Castellano, *on the brief*), Kew Gardens, NY, *for* Richard A. Brown, Queens County District Attorney, *for Respondent-Appellee Eric T. Schneiderman.*

PER CURIAM:

Petitioner-appellant Rudolph Hawthorne appeals from a December 9, 2010 judgment of the United States District Court for the Eastern District of New York (Nina Gershon, *Judge*) denying his petition for a writ of habeas corpus. Because the Appellate Division of the New York State Supreme Court, Second Department, issued a reasonable decision on the merits of petitioner's claim, to which we are required to defer, we affirm the judgment of the District Court.

This appeal arises out of a petition for a writ of habeas corpus filed by Rudolph Hawthorne, who at the time was proceeding *pro se.*[2] Hawthorne is incarcerated pursuant to a state court judgment convicting him, after a jury trial, of criminal possession of a weapon and assault on one Milton Tennessee.[3] The facts elicited at trial demonstrated that, on or about October 31, 2000, Tennessee and another man, Kelvin Armstead, were attacked by a man wielding a hammer. Armstead, who sustained approximately ten blows, died of his wounds; Tennessee, who sustained only one to two blows and survived the attack with severe brain damage, is paralyzed on his right side and unable to speak.

On November 2, 2000, the day after the crime was discovered, Hawthorne was briefly interviewed in connection with the attack by Detective Edgecombe, the lead investigator on the case. The interview took place at the local police precinct, but Hawthorne was not placed in custody. On

---

[2] Hawthorne was unrepresented during the District Court proceedings. On July 6, 2011, we appointed appellate counsel pursuant to the Criminal Justice Act. We thank appointed counsel for her service in this case.

[3] Hawthorne was also convicted at trial of murder in the second degree. That conviction was reversed by the Appellate Division of the New York State Supreme Court for reasons unrelated to this appeal. *See People v. Hawthorne*, 35 A.D.3d 499 (2d Dep't 2006).

2

November 13, he voluntarily returned to the precinct at approximately 1:45 p.m. to conduct a supplemental interview. After several hours of interrogation, Hawthorne confessed to another investigator, Detective Bardin, that he had committed the attacks on Tennessee and Armstead.

Although Hawthorne had not been read his *Miranda*[4] rights earlier in the interview, Bardin testified that, immediately after Hawthorne began to implicate himself in the crime, Bardin stopped the interview and read Hawthorne his *Miranda* rights. Hawthorne signed a waiver of his *Miranda* rights at 8:45 p.m. on November 13, 2000, and thereafter dictated a written confession to Detective Bardin.[5] The confession, signed by Hawthorne at 9:45 p.m. that night, was the only evidence connecting Hawthorne to the crime.

After exhausting his state court appeals, Hawthorne filed his petition for a writ of habeas corpus on September 27, 2007, alleging that his confession was the result of a violation of his *Miranda* rights; that his counsel was ineffective at a suppression hearing regarding that confession; and that the prosecutor in his case had engaged in misconduct. The petition was referred to Magistrate Judge Cheryl L. Pollak, who on July 22, 2009, in a thorough and detailed Report and Recommendation (the "Report"), recommended denial of the petition in full. As relevant here, the Report held that petitioner's *Miranda* claim had not been exhausted in the state courts and that, because petitioner had already taken his permitted direct and collateral state appeals, the claim was also procedurally defaulted. *Hawthorne v. Spitzer*, No. 07-cv-4128, 2009 WL 6895978, at *23–24 (July 22, 2009).

On September 19, 2010, Judge Gershon adopted the Report in its entirety and denied the petition for habeas corpus. In pertinent part, she held that petitioner had not established that his counsel had rendered ineffective assistance at a pre-trial suppression hearing conducted pursuant to

---

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[5] Later that night or early the next morning, Hawthorne repeated his confession on video tape at the behest of the assigned Assistant District Attorney.

*People v. Huntley*, 15 N.Y.2d 72 (1965) (the "*Huntley* hearing," or the "hearing").[6]  *Hawthorne v. Spitzer*, No. 07-cv-4128, 2010 WL 3803861, at *2 (Sept. 20, 2010).  Judgment was entered on December 9, 2010.

We granted a certificate of appealability on July 5, 2011 on the following issues: (1) whether petitioner had established prejudice for the procedural default of his claim that his *Miranda* rights were violated; and (2) whether petitioner received ineffective assistance of counsel during the *Huntley* hearing, where (i) counsel failed to cross-examine either of the detectives who interrogated petitioner on the day he confessed to the crime, and (ii) counsel allegedly refused to permit petitioner to testify on his own behalf.[7]

## DISCUSSION

We review a district court's denial of a writ of habeas corpus *de novo*, and review any factual findings for clear error.  *Drake v. Portuondo*, 553 F.3d 230, 239 (2d Cir. 2009).  As a result of our *de novo* review, we affirm the judgment of the District Court.

A.    *Ineffective Assistance of Counsel*

Petitioner argues that he was deprived of the effective assistance of counsel when his *Huntley* counsel failed to cross-examine either Detective Edgecombe or Detective Bardin, the two detectives who (among others) interrogated him on November 13, 2000.  In order to determine whether a federal habeas petitioner was deprived of the effective assistance of counsel, courts follow the rule set out in *Strickland v. Washington*, 466 U.S. 668 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction . . . has two components.  First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant

---

[6] Petitioner retained new counsel at some point after the *Huntley* hearing and before the trial.  **A56.**  We therefore refer to the attorney who represented petitioner at the hearing as "*Huntley* counsel."

[7] We declined to grant a Certificate of Appealability based upon petitioner's prosecutorial misconduct allegations.

makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* at 687.

The petitioner argued in the Appellate Division of the New York State Supreme Court that he had been prejudiced by *Huntley* counsel's failure to examine the detectives.[8] Br. of Appellant at 39, *People v. Hawthorne*, 35 A.D.3d 499 (2d Dep't 2006) (No. 03-5646), *leave to appeal denied*, 8 N.Y.3d 946 (2007). The Appellate Division, while vacating another of petitioner's convictions, summarily denied relief on his ineffective assistance of counsel claim. *Hawthorne*, 35 A.D.3d at 502 (holding that "[t]he defendant's remaining contentions are without merit").

We are required to defer to a state court's adjudication of an issue on the merits, unless the state court's decision is "contrary to, or involve[s] an unreasonable application of, clearly established Federal law . . . [or is] based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "For the purposes of AEDPA deference, a state court 'adjudicate[s]' a state prisoner's . . . claim on the merits when it (1) disposes of the claim 'on the merits,' and (2) reduces its disposition to judgment. When a state court does so, a federal habeas court must defer . . . to the state court's decision." *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001)) (quoting 28 U.S.C. § 2254(d)(1)) (alteration in the original). A summary disposition constitutes a disposition "on the merits." *Harrington v. Richter*, 131 S. Ct. 770, 784–85 (2011)

AEDPA unquestionably requires deference to a state court's "summary disposition" of an appeal. *See id.* at 784. ("Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny

---

[8] The heading for Point Two of Hawthorne's brief to the Appellate Division read as follows: "Appellant was denied the effective assistance of counsel when, at a *Huntley* hearing, defense counsel failed to make any argument, cross-examine the interrogating detective, call appellant to the stand, or try to elicit any testimony or facts whatsoever in support of his claim that appellant's statements, which were the only evidence linking him to the killing, were involuntary, coerced and obtained in violation of his right to counsel." Br. of Appellant at 39, *People v. Hawthorne*, 35 A.D.3d 499 (2d Dep't 2006) (No. 03-5646).

relief."). Where, as here, a state appellate court decides an issue of federal law in a summary fashion, *see Hawthorne*, 35 A.D.3d at 502, we exercise AEDPA deference by asking, first, "what arguments or theories . . . could have supported" the decision of the state court, and second, "whether it is possible fair-minded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Harrington*, 131 S. Ct. at 786. As explained below, the decision of the Appellate Division merits such deference.

The evidence presented at trial was available to the Appellate Division when it determined petitioner's *Strickland* claim. Although petitioner's *Huntley* counsel did not cross-examine either detective at the *Huntley* hearing regarding the voluntariness of petitioner's confession, trial counsel conducted a thorough cross-examination of both detectives before the jury. Detective Edgecombe testified, on cross-examination, that neither he nor any other detective had threatened or otherwise coerced petitioner during the first several hours of interrogation. Detective Bardin testified similarly on direct and cross-examination. It would not be an unreasonable application of clearly established federal law for the Appellate Division to have determined that the evidence elicited by the defendant at trial would likewise have been elicited by competent counsel at the *Huntley* hearing, and that that evidence did not merit suppression of the confession.[9]

We determine that the decision of the Appellate Division was not "contrary to," nor did it involve "an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," 28 U.S.C. § 2254(d)(1). Although we might not have decided the issue in the way that the Appellate Division did, *see Cavazos v. Smith*, 132 S. Ct. 2, 4 (2011)—and indeed we are troubled by the

---

[9] In *Jackson v. Denno*, 378 U.S. 368 (1964), the Supreme Court held that a defendant who challenges the admission of a pre-trial confession on voluntariness grounds must receive a full and fair hearing before the trial judge (a "*Jackson* hearing"), outside the presence of the jury, on the issue of voluntariness. *Id.* at 377. The trial court properly conducted a *Jackson* hearing and determined that petitioner's confession was not involuntarily made. Petitioner does not, and could not, argue that the *Jackson* hearing did not occur. Instead, he argues that his counsel was constitutionally ineffective (or effectively absent) during the course of that hearing. Accordingly, the only issue on appeal is petitioner's claim, brought under the Sixth Amendment, that his counsel was ineffective at the suppression hearing. We therefore cannot grant relief absent a showing of prejudice—a showing which is precluded by the decision of the Appellate Division. *See Strickland*, 466 U.S. at 687.

6

outcome we are constrained to reach—we cannot say that it would be "[im]possible" for the proverbial

"fairminded jurist[ ]" to conclude that no prejudice occurred, *see Richter*, 131 S. Ct. at 786. We therefore

must defer to the determination made by the state court, and hold that petitioner was not prejudiced by

*Huntley* counsel's alleged ineffectiveness. *See Sellan*, 261 F.3d at 312.[10]

B.     *Defaulted* Miranda *Claim*

Petitioner argues that his *Miranda* rights were violated by the detectives who interrogated him on

November 13, 2000, and that his confession should therefore have been suppressed. This claim was

evidently not raised to the state courts on direct appeal,[11] and is therefore both unexhausted and

procedurally defaulted. *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Petitioner accordingly must

"demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal

law" in order for us to review the defaulted claim. *Id.* Because our Certificate of Appealability

specifically referred to the prejudice prong of *Coleman*, we limit our review to petitioner's claim that he

was prejudiced by the alleged violation of his *Miranda* rights. *See Valverde v. Stinson*, 224 F.3d 129, 136 (2d

Cir. 2000) (noting that the Court of Appeals should address only claims included in certificate of

appealability).

A finding that a defendant's *Miranda* rights were violated prior to his confession is not sufficient,

in and of itself, to establish that the admission of a later, "Mirandized," confession prejudiced the

defendant. As the Supreme Court has held, although "*Miranda* requires that the unwarned admission

---

[10] Petitioner appears to claim that *Huntley* counsel's alleged refusal to allow him to testify at the hearing constituted so-called "structural error," and was therefore inherently prejudicial. *See, e.g.*, *Puckett v. United States*, 556 U.S. 129, 140–41 (2009); *Gibbons v. Savage*, 555 F.3d 112, 119 (2d Cir. 2009) ("[S]tructural errors are those to which the harmless error analysis does not apply, as they are deemed to render a criminal trial fundamentally unfair.").

Although the Supreme Court has stated that a defendant has the absolute right to testify *at trial*, and that trial counsel's refusal to permit the defendant to testify at trial may constitute constitutional error, *Rock v. Arkansas*, 483 U.S. 44 (1987), the Supreme Court has never explicitly extended that absolute right to pre-trial hearings. Accordingly, even if trial counsel did prevent Hawthorne from testifying at the *Huntley* hearing, the state court's determination that trial counsel's actions did not constitute ineffective assistance of counsel would not constitute a "decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, *as determined by the Supreme Court of the United States*." 28 U.S.C. § 2254(d)(1) (emphasis added).

[11] Petitioner did not petition for state collateral review of his conviction.

must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." *Oregon v. Elstad*, 470 U.S. 298, 309 (1985).

It is indisputable that both petitioner's written and videotaped statements were made after he had heard, and waived, his *Miranda* rights: while the written *Miranda* waiver was signed at 8:45 p.m., the written statement was not signed until 9:45 p.m., and the videotaped statement was made at some point later that night or early the next morning. Accordingly, the only remaining question is whether petitioner's inculpatory statements made after he signed the *Miranda* waiver were "knowingly and voluntarily made." *Id.*

Petitioner's *Miranda* claim can be resolved by reference to our holding on his primary claim—that his *Huntley* counsel was not prejudicially ineffective by failing to demonstrate at the *Huntley* hearing that the confessions were involuntary.[12] As discussed above, New York's appellate courts have already determined, on direct review of the conviction, that the trial court's finding that the confessions were voluntary did not violate the Constitution. Absent a misapplication of clearly established Supreme Court precedent, we may not disturb their determination of this matter. Accordingly, we hold that petitioner cannot show that the alleged violation of *Miranda* rendered his written and videotaped confessions inadmissible.

Because petitioner cannot show that he was prejudiced by the alleged *Miranda* violation, we affirm the District Court's holding that the *Miranda* claim is procedurally barred.[13]

---

[12] Although a "Mirandized" confession that closely follows an un-Mirandized confession may itself be constitutionally suspect, *see Missouri v. Seibert*, 542 U.S. 600, 621 (2004) (Kennedy, J., concurring); *United States v. Moore*, 670 F.3d 222, 227–29 (2d Cir. 2012), petitioner does not argue that the evidence shows that the written or videotaped confessions came as a result of a "deliberate two-step interrogation technique," *Moore*, 670 F.3d at 227; *see also United States v. Williams*, 681 F.3d 35, 40–41 (2d Cir. 2012).

[13] Petitioner argues that his *Miranda* claim was in fact presented to the state court when, in his brief to the Appellate Division, he argued that "there is a reasonable likelihood that counsel would have succeeded in proving a violation of his *Miranda* rights." Assuming, *arguendo*, that that argument was sufficient to present the issue to the Appellate Division, we would deny habeas relief because the state court would have decided the *Miranda* claim on its merits. *See* Part A, *ante*.

CONCLUSION

We have carefully reviewed the record and determine that petitioner's claims are meritless.

Accordingly, for the reasons stated above, we AFFIRM the judgment of the District Court.

Calabresi, *Circuit Judge*, concurring:

This is one of the rare cases in which a habeas petitioner may well be innocent. *Cf.* Henry J. Friendly, *Is Innocence Irrelevant? Collateral Attack on Criminal Judgments*, 38 U. CHI. L. REV. 142, 148 (1970) (fearing for "the unusual case of the innocent man" in danger of "being burdened by so much dross in the [habeas] process"). Hawthorne was convicted solely on the basis of his confession—a confession that he claims was coerced and that is squarely contradicted in many of its particulars by the physical evidence obtained at the crime scene.

The question of Hawthorne's innocence, however, is not the one we are encouraged—or, at times, even allowed—to ask in habeas cases such as this. During the past several decades, many both inside and outside the courts have called for federal habeas review to focus on issues that "cast doubt upon the prisoner's guilt," *Schneckloth v. Bustamonte*, 412 U.S. 218, 258 (1973) (Powell, J., concurring), rather than "technical errors unrelated to guilt or innocence," Warren E. Burger, Annual Report to the American Bar Association by the Chief Justice of the United States, 67 A.B.A. J. 290, 292 (1981). Yet, amidst these calls, the Supreme Court and Congress have shaped habeas review so that technical errors—typically by prisoners and their counsel—often preclude genuine inquiry into guilt and innocence. *See* Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214; *Coleman v. Thompson*, 501 U.S. 722, 746-51 (1991); *Murray v. Carrier*, 477 U.S. 478, 490-91 (1986); *Wainwright v. Sykes*, 433 U.S. 72, 87-91 (1977).

I recognize that tradeoffs between accuracy and fairness on the one hand, and efficiency and comity on the other, are unavoidable, and not unique to habeas. Yet recent Supreme Court decisions seem to me to limit the former while doing nothing that usefully promotes the latter. Last year, in *Harrington v. Richter*, the Court held

1

that a state court's rejection of a habeas petitioner's federal claims warrants AEDPA deference even when the state court gives no reasons for its rejection. 131 S. Ct. 770, 784-85 (2011). When, as in the case before us, the state court asserts without further explanation that "[t]he defendant's remaining contentions are without merit," we are to *imagine* what reasons the state court might have had for its conclusion. Sometimes—as again in the instant case, *see supra* at 6–7—the reasons we invent are ones that we then go on to brand as potentially dubious under clearly established federal law. Still, if our imagined reasons, even if quite incorrect, are not *so* incorrect under Supreme Court holdings that we could not imagine "fair-minded jurists" who would approve of them, *Richter* holds that our review is over. *See Richter*, 131 S. Ct. at 786.

This is not comity. If anything, it is insulting to New York. We impute a view to its courts that they have never in fact espoused. We then deride that view as wrong, even clearly wrong under federal appellate court precedents, just not unreasonably wrong under prior Supreme Court holdings. But why should one assume that New York courts, if they actually considered the federal question involved, would decide it differently from the bulk of federal appellate courts?

Nor is it clear how this process promotes efficiency. If the state court has in fact given full and thoughtful consideration to Hawthorne's federal arguments, it would surely be more efficient for us to review an opinion in which that court's reasoning is stated, even if briefly, rather than having to imagine what that reasoning might have been. Reviewing actual reasons rather than imputing hypothetical ones would be more efficient not just for the federal courts, but also for litigants, who now are forced to anticipate every argument that we might conceive.

2

Under the present system, the only efficiencies gained are to the state courts. And they are minor ones. Such courts are saved the trouble of writing down the reasons for their decisions. *See Richter*, 131 S. Ct. at 784 (recognizing state courts' pressing need, given their case loads, to "concentrate [their] resources where opinions are most needed"). But, if conserving state resources is the goal, why do we *force* state courts to think through petitioners' federal claims at all?

As I explained a decade prior to *Richter*, if state courts were not given AEDPA deference—or if they were not given the full measure of AEDPA deference—when they disposed of claims summarily, they would be able, if they so chose, to leave complicated federal questions to the federal courts. *See Washington v. Schriver*, 255 F.3d 45, 62 (2d Cir. 2001) (Calabresi, *J.*, concurring). This would advance AEDPA's purpose of ensuring meaningful habeas review while preventing the statute from imposing—contrary to its purposes—an unmanageable burden on state courts to police federal law. State courts would be free to decide issues of federal law if they wished, and when they did, federal courts would be required to defer to them. But state courts would not be forced to take on that task if they preferred not to.

Soon after *Schriver*, this Court chose to take a different path from that which I had urged. *See Sellan v. Kuhlman*, 261 F.3d 303, 311-14 (2d Cir. 2001). Among the concerns *Sellan* expressed was that my preferred course would "have the practical effect of shunting serious arguments as to state claims to state court, and serious arguments as to federal claims to federal court." *Id.* at 314. I myself see nothing wrong with this: our Court does it regularly when we certify important questions of state law to state supreme courts, which are best positioned to answer them.

But even those who fear this outcome should note that something much worse has actually come about as a result of the *Sellan/Richter* approach. In the case before

3

us, for example, the only serious consideration of "arguments as to federal claims" can be found in federal court opinions—ours and that of the district court—not in those of state courts. Realistically, then, Hawthorne's federal claims *were* in fact "shunt[ed]" to the federal courts. Moreover, and most troubling, the federal courts, to which the claims were shunted, were barred from answering the shunted federal questions in the way they thought best. *Sellan* and *Richter* instead required the federal courts to set their own considered reasons aside and defer to hypothetical reasons which the state courts may or may not ever have entertained. Habeas review is more than inefficient when it requires courts to play this kind of guessing game about other courts' reasoning; indeed, when it makes courts defer to imaginary reasons, habeas review, in my judgment, becomes downright foolish.

\*     \*     \*

In any event, it is clear what habeas today is *not.* It is not focused on the possible innocence of the defendant. In the present case, we find ourselves, like Plato's painted bed, at two removes from reality: asking not whether Hawthorne is guilty of the brutal crimes charged, nor even whether his lawyer's clearly inadequate performance may have prejudiced Hawthorne's defense against those charges. Instead, we can ask only whether *someone* might have *some* reason—not necessarily even a good one—for thinking that matters probably would have turned out the same for Hawthorne even if his lawyer had performed adequately. What is served by this exercise? Not efficiency, since we have spent our time speculating as to the state court's reasoning, and litigants are forced to address every reason we might concoct. Not comity, since we first provide, and then criticize, the very reasoning to which we purport to defer. And certainly not reasoned inquiry into guilt or innocence, as Mr. Hawthorne remains in jail for crimes he may not have committed.

4

Nevertheless, I believe that the opinion of the Court states the law as it is today, and, since I am bound to follow that law, I concur.