UNITED STATES of America,

v.

Robert MEDINA, a/k/a "Pops," Ruben Estrada, a/k/a "Mafia," and John Jones, a/k/a "Doe," a/k/a "Doughboy," Defendants.

No. S3 13 Cr. 272 (PGG).

United States District Court, S.D. New York.

Signed May 7, 2014.

Filed May 8, 2014.

Christopher Joseph Dimase, Amie Nicole Ely, Jessica Ortiz, U.S. Attorney's Office, SDNY, New York, NY, for United States of America.

David Matthew Rody, Drew Godfrey Rolle, Michael D. Mann, Pouneh Aravand, Timothy James Treanor, Sidley Austin LLP, Susan Vicki Tipograph, Susan V. Tipograph, Attorney at Law, Ira D. London, Law Office of Ira D. London, New York, NY, John M. Burke, John Burke, Brooklyn, NY, for Defendants.

### MEMORANDUM OPINION & ORDER

PAUL G. GARDEPHE, District Judge:

Defendant Robert Medina is charged with (1) conspiring to distribute, and to possess with intent to distribute, 280 grams or more of crack cocaine, and marijuana, in violation of 21 U.S.C. § 846; (2) using and carrying a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c); and (3) on July 28, 2012, using and carrying a firearm in connection with a drug trafficking crime, and causing the death of a person through use of a firearm, in violation of 18 U.S.C. § 924(j). (S3 Indictment (Dkt. No. 111)).

On July 1, 2013, Medina moved to suppress evidence "of his arrest, identification, and purported [post-arrest] statements" made to members of the New York City Police Department ("NYPD") on July 28, 2012, claiming that police officers had violated his rights under the Fourth, Fifth, and Fourteenth Amendments. (Dkt. No. 11; Nov. 16, 2013 Def. Br. (Dkt. No. 43) at 1) For the reasons stated below, Medina's motion to suppress will be denied.

### BACKGROUND

Medina's arrest arose from the NYPD's investigation of two shootings in the Bronx on July 28, 2012. (Hearing Tr. 16, 142) The first shooting took place at about 1:00 a.m. near 222nd Street and White Plains Road, and resulted in a non-fatal injury to a bystander outside Scotty Pump Ups Tav-

ern ("Scotty's"). (Hearing Tr. 142) The second shooting took place at about 5:00 a.m. near 228th Street and White Plains Road, and caused the death of Gary Clark. (Hearing Tr. 16, 18, 196).

## I. *MEDINA'S AFFIDAVIT*

In an affidavit submitted in support of his motion to suppress, Medina states that he was inside his girlfriend's apartment— Apt. 1A, 721 East 228th Street—on the morning of July 28, 2012.[1] (July 1, 2013 Rody Decl. (Dkt. No. 12), Ex. A ("Medina Aff.") ¶¶ 2, 4) At approximately 9:30 a.m., he awoke to hear police officers pounding on the door. (*Id.* ¶ 4) After Medina's girlfriend unlocked the door, officers pushed it open and entered. (*Id.* ¶¶ 4, 5).

Once inside, officers ordered Medina to get out of bed, grabbed him by the arm, and pulled him into the hallway. (*Id.* ¶ 5) An officer then took Medina down the hall to a stairwell, instructed him to sit, and questioned him about a shooting. (*Id.* ¶¶ 5, 6) Medina was not given *Miranda* warnings. (*Id.* ¶ 6) At one point during the interview, Medina asked to return to the apartment; his request was denied. (*Id.*) Medina does not aver how long he was questioned, but ten minutes after the questioning ended, he was allowed to return to the apartment and the officers left. (*Id.* ¶ 7) Medina went back to sleep. (*Id.* ¶ 8).

About two hours later, officers returned to the Apartment 1 A, pounded on the door, identified themselves as "NYPD," and shouted for the occupants to "open the door, now." (*Id.* ¶ 9) They also warned that they did not "want to have to kick the door down," and that they had "people at the windows." (*Id.*).

When Medina opened the door, he saw several officers with their guns drawn "but not pointed at [him]." (*Id.* ¶ 10) An officer then entered the apartment, grabbed Medina, pulled him into the hallway, and pushed him up against a wall, where he was frisked and handcuffed. (*Id.*) Medina claims that he told the officers that he wanted to speak to a lawyer. (*Id.* ¶ 11) Detective Mullarkey responded, "You watch too much TV." (*Id.*) Medina was not given *Miranda* warnings. (*Id.* ¶ 12).

Medina was then transported to the 47th Precinct. (*Id.*) Medina claims that he told another detective that he wanted a lawyer, but that detective told him that they would "talk about that later." (*Id.* ¶ 13) Medina was then placed in an interview room. (*Id.*) He was not given *Miranda* warnings. (*Id.*).

Medina states that he remained in the interview room for "many hours." (*Id.* ¶ 14) Officers occasionally entered the room during that time. (*Id.*) After Medina complained that he was cold—because of the air conditioning and his wet clothing— he was given an NYPD raincoat. (*Id.*) Medina repeatedly asked whether he was free to leave; officers told Medina that he could not leave, and that he would have to speak with the arresting officer. (*Id.*).

After approximately eight hours, Detective Crisfield, Detective Mullarkey, and a third detectives entered the interview room and introduced themselves. (*Id.* ¶ 15) Medina asked why he had been arrested and was told, "You know what for." (*Id.*) Medina then asked if he could go home, and Detective Mullarkey replied "in substance" that "[i]f you say the right things you can go home tonight." (*Id.*) The officers then questioned him for about an hour without giving him *Miranda*

---

1. Medina states that he had been in a relationship with his girlfriend—Ivette Rodrigues—for about two months, and that he "often stayed overnight at her apartment." (Medina Aff. ¶ 3).

warnings. (*Id.*) They provided Medina with Chinese food and cigarettes during this interview. (*Id.*) Medina does not allege what was discussed during this interview. (*Id.*).

After the interview, Detective Crisfield told Medina that he could not "use" any of the interview because Medina had not been read his *Miranda* rights. (*Id.* ¶ 16) Crisfield stated that he would read *Miranda* warnings to Medina and that Medina should then sign a form acknowledging that he had been read his rights.[2] (*Id.*).

Medina signed the *Miranda* form but "refused to acknowledge item '5.'"[3] (*Id.* ¶ 17) After Medina signed the *Miranda* form, the detectives did not repeat any of the questions asked previously, but instead asked Medina whether he recognized a particular phone number and whether he recognized a man in a photograph. (*Id.* ¶ 18) Medina was then taken to a cell. (*Id.* ¶ 19).

## II. *SUPPRESSION HEARING TESTIMONY*

The Court conducted a hearing concerning Medina's suppression motion on August 20, 2013, August 21, 2013, and October 25, 2013. NYPD Lieutenant John Fitzpatrick and Detectives Craig Crisfield, Robert Regnier, Gregory Mullarkey, and Steven Smith testified. Medina did not testify or call any witnesses.

As noted above, Medina's arrest was the product of the NYPD's investigation of (1) a shooting at about 1:00 a.m. on July 28, 2012, near 222nd Street and White Plains Road, which resulted in a non-fatal injury to a bystander outside Scotty's; and (2) a shooting at about 5:00 a.m. that same day near 228th Street and White Plains Road that caused the death of Gary Clark. (Hearing Tr. 16, 18, 142, 196) Detective Crisfield was the lead detective for the shooting outside Scotty's. (Hearing Tr. 142) Detective Mullarkey was the lead detective for the Clark homicide, and was assisted by Detectives Smith and Regnier. (Hearing Tr. 55–56, 142, 268–69, 288–89, 365–67) Lieutenant Fitzpatrick supervised the investigation of both shootings. (Hearing Tr. 15–17, 55–56).

Fitzpatrick, Crisfield and other NYPD officers who arrived at the scene of the Clark homicide on the morning of July 28, 2012 observed a bullet-ridden red Cadillac and blood on the ground across the street from an apartment building located at 721 East 228th Street. (Hearing Tr. 30–31, 144) The officers learned that Clark had driven the red Cadillac to this location shortly before his death. (Hearing Tr. 30–31).

Lieutenant Fitzpatrick and other NYPD officers who reported to the scene of the Clark homicide that morning reviewed video footage shot on two nearby security cameras. (Hearing Tr. 23–24) The cameras were trained on an apartment building located at 721 East 228th Street. (Hearing Tr. 23–24) Shortly before Clark was shot, the videotape showed several men milling about in front of the building. (GX 5; Hearing Tr. 19, 368) At the entrance to an alleyway next to the building, one man approached another, and they appeared to speak briefly. (GX 5; Hearing Tr. 19, 368, 372) The first man then

---

**2.** As is discussed below, the *Miranda* form (GX 6) includes six questions concerning the suspect's rights and his willingness to answer questions. Printed next to five of the questions is the word "yes" and Medina's initials. Medina does not address whether this printing is his.

**3.** Question 5 on the *Miranda* form states: "If you do not have an attorney available, you have the right to remain silent, until you have the opportunity to consult with one. Do you understand question # 5?" (GX 6).

walked away, while the other walked into the alley, bent down, and retrieved a long firearm that appears to be a shotgun or rifle. (GX 5; Hearing Tr. 19) That man then returned to East 228th Street, pointed the weapon across the street, and fired approximately three times in the vicinity of where Clark's body was found. (GX 5; Hearing Tr. 19, 27, 373) After the shooting, several men who had been standing in front of the building—including the shooter—ran into 721 East 228th Street. (Hearing Tr. 368, 376–77) One of the detectives who reviewed the videotape—Detective Bonacardi—recognized Defendant Ruben Estrada as the shooter. (Hearing Tr. 57–58).

After watching the videotape, Lieutenant Fitzpatrick directed other police officers to canvass buildings in the area. (Hearing Tr. 30–33) Detectives Crisfield and Mullarkey canvassed 721 East 228 Street at about 9:30 a.m. (Hearing Tr. 146, 293).

When Crisfield knocked on the door to Apartment 1A at 721 East 228th Street, a woman answered the door and told Crisfield that she and her boyfriend—Defendant Medina—were in the apartment, but that neither had seen or heard anything related to the shooting the night before. (Hearing Tr. 147–50) Crisfield did not speak with Medina at that time; his girlfriend reported that he was sleeping. (Hearing Tr. 150).

While the canvass was taking place, Lieutenant Fitzpatrick examined Clark's vehicle, the bullet-ridden red Cadillac. (Hearing Tr. 30–31) Bullet holes on the passenger side of the car "looked like they were going from the back towards the front of the car." (Hearing Tr. 31).

Soon after, an NYPD detective participating in the canvass told Lieutenant Fitzpatrick that a resident of 721 East 228th Street had suggested that officers "check Apartment 1 A." (Hearing Tr. 32) Fitzpatrick and Detectives Crisfield, Regnier, Mullarkey, and Smith then returned to that building and searched the stairways, common areas, and roof for evidence of the shooter or the firearm depicted in the video footage. (Hearing Tr. 32–33, 150–51, 198, 270, 294, 378) The search yielded nothing. (Hearing Tr. 33).

At some point between 10:00 a.m. and 11:00 a.m., Fitzpatrick and the detectives knocked on the door of Apartment 1A. Medina's girlfriend opened the door. (Hearing Tr. 34, 65, 71–72, 151) The detectives asked if they could enter and talk with her about the shooting the night before, and she agreed. (Hearing Tr. 34) Once inside the apartment, the detectives found Medina in bed. He was instructed to step outside the apartment. (Hearing Tr. 34–35, 72–73, 153–54).

As Medina left the apartment, Fitzpatrick noticed that he was limping, and he asked Medina to identify himself. (Hearing Tr. 35, 75) When Fitzpatrick heard Medina's name, he recalled that Medina had been shot earlier that summer outside Scotty Pump Ups Tavern, a bar located at 222nd Street and White Plains Road. The police had interviewed Medina at that time. (Hearing Tr. 35, 75) Fitzpatrick believed that the earlier shooting of Medina outside Scotty's might be related to the non-fatal shooting outside Scotty's that morning. (Hearing Tr. 35–36) Fitzpatrick told one of the investigating detectives about the earlier shooting of Medina outside Scotty's, and told that detective to keep this incident in mind when questioning Medina.[4] (Hearing Tr. 75–76).

4. It is not clear which detective Lieutenant Fitzpatrick spoke to. Smith did not recall any

such conversation with Fitzpatrick, and Crisfield testified that he did not learn any details

Lieutenant Fitzpatrick directed Medina down the hall to Detectives Smith and Crisfield, who were standing near a stairwell. Detective Regnier then questioned Medina's girlfriend. (Hearing Tr. 36, 381).

Detectives Crisfield and Smith questioned Medina for less than fifteen minutes as he sat on the staircase. (Hearing Tr. 156, 158, 201, 381–83) Medina was not restrained or handcuffed, and according to Smith and Fitzpatrick, Medina was free to leave at any time.[5] (Hearing Tr. 77, 381–83) The detectives did not administer *Miranda* warnings to Medina. (Hearing Tr. 405).

Crisfield told Medina that he had been at Apartment 1A earlier that morning, but that he and the other detectives had returned to investigate new information suggesting that Medina "might have been involved" in the shooting outside 721 East 228th Street. (Hearing Tr. 156,201) Smith obtained pedigree information from Medina, and then asked whether Medina had seen or heard anything about "what happened." (Hearing Tr. 381–82) Medina said that he had been "smoking weed" in the lobby and had not seen anything. (Hearing Tr. 383) Medina then lowered his voice, however, and told Smith to check the security cameras outside the building. (Hearing Tr. 383) Medina told Smith that the cameras would "tell you everything you want to know." (Hearing Tr. 383) During this conversation, Medina volunteered that he had been shot previously. (Hearing Tr. 404) Smith's conversation with Medina at

the stairwell lasted about ten minutes and was amicable throughout. (Hearing Tr. 383) After the detectives finished questioning Medina's girlfriend, Medina was permitted to return to the apartment and detectives left. (Hearing Tr. 384).

Between noon and 1:00 p.m., Lieutenant Fitzpatrick spoke by telephone with a confidential informant ("CI") who stated that he had witnessed a shooting in front of Scotty's tavern that morning.[6] (Hearing Tr. 39–40) The CI said that he had been standing in front of Scotty's when he saw a man known to him as "Pops" running up the street and shooting at a red Cadillac as it drove by. (Hearing Tr. 40, 104) The CI identified Pops as the "same guy [who was] shot in front of Scotty's ... earlier this summer." (Hearing Tr. 41) The CI stated that Defendant Estrada was with Pops but was not holding a gun. (Hearing Tr. 131).

The CI told Fitzpatrick that Pops had been on the east side of the street, in front of Scotty's, and fired shots at the passenger side of the red Cadillac as it drove northbound. (Hearing Tr. 40) The CI's description was consistent with Fitzpatrick's observations of the red Cadillac at the scene of the Clark homicide. (Hearing Tr. 40) The CI also told Fitzpatrick that Pops had been shooting a .45 caliber semi-automatic handgun, and had hit a bystander down the street from Scotty's while shooting at the red Cadillac. (Hearing Tr. 40, 87) The CI's account was likewise consistent with other information

about the prior shooting of Medina until after Medina's arrest. (Hearing Tr. 166–67, 401–02).

5. Smith testified that Medina never asked to leave the building or go anywhere other than his girlfriend's apartment to retrieve a sweatshirt. Medina was not permitted to return to the apartment while his girlfriend was being questioned. (Hearing Tr. 381–83).

6. Fitzpatrick testified that he had been working with the CI for about eight months prior to July 28, 2012, and that he knew that the CI was familiar with the 228th Street neighborhood. (Hearing Tr. 43–45, 128) Fitzpatrick also testified that he had been able to corroborate information that the CI had provided in the past. (Hearing Tr. 43–45, 128).

Fitzpatrick had obtained indicating that the bystander had been shot after leaving a restaurant about a half a block away from Scotty's. (Hearing Tr. 40).

After speaking with the CI, Fitzpatrick believed that Medina was responsible for the shooting outside Scotty's. (Hearing Tr. 41) The CI agreed to come to the station house later that day to confirm the identity of "Pops." (Hearing Tr. 42)

In the early afternoon—before the CI had identified Medina's photograph—Fitzpatrick decided that Medina should be arrested. (Hearing Tr. 42) Fitzpatrick believed that "time was of the essence," given "the amount of violence going on and with what [the police had] put together." (Hearing Tr. 42) Accordingly, he authorized the arrest of Medina even before the CI had viewed a photograph of Medina and confirmed that Medina was "Pops." (Hearing Tr. 42, 107).

Between 2:00 and 3:00 p.m., Lieutenant Fitzpatrick and approximately seven or eight detectives—including Crisfield, Regnier, and Mullarkey—returned to Apartment 1A to arrest Medina. (Hearing Tr. 45–46, 160–61, 273–74, 300) Four or five officers (including Fitzpatrick) stationed themselves at the front door of the apartment, and at least two were outside the windows of the ground-level apartment. (Hearing Tr. 111, 115, 161, 301) The officers pounded on the door, saying "open up" and stating that they were looking for Medina. (Hearing Tr. 45–46, 111, 301) Fitzpatrick had his gun in his hand, but could not recall whether other officers had their guns drawn. (Hearing Tr. 46) Regnier did not recall that any officer had his gun drawn. (Hearing Tr. 285–86) Mullarkey stated that he might have had his gun drawn, but he could not recall whether any

other officer had drawn his weapon.[7] (Hearing Tr. 331).

According to Fitzpatrick and Mullarkey, Medina answered the door, stepped out into the hallway, and was fully compliant. (Hearing Tr. 46, 113–14, 302) Medina was handcuffed in the hallway and placed under arrest. (Hearing Tr. 113, 302) He was not given *Miranda* warnings (Hearing Tr. 115, 215, 286–87, 302–03), and—according to Fitzpatrick, Regnier, and Mullarkey— did not ask for a lawyer at that time. (Hearing Tr. 116, 274, 337) Medina was transported to the station house between 3:00 and 3:30 p.m. (Hearing Tr. 46, 113, 117, 162–64, 303) Mullarkey, who accompanied Medina, testified that Medina did not ask for an attorney during the ride to the station house. (Hearing Tr. 303, 340–41).

At the station house, Mullarkey put Medina in an interview room on the second floor. The room was equipped with a table, a few chairs, and a one-way window. (Hearing Tr. 117–18, 163–64, 304) Medina's handcuffs were removed. (Hearing Tr. 304) He did not request an attorney at that time. (Hearing Tr. 304).

Crisfield testified that he was responsible for Medina while he was in the interview room, and that he checked on Medina at least once every half-hour. (Hearing Tr. 164–66) Medina was given a jacket after complaining about the air conditioning in the interview room. (Hearing Tr. 165) He was also given coffee, food, and cigarettes, and allowed to use the restroom. (Hearing Tr. 165, 185).

At about 3:30 p.m., the CI arrived at the station house, and Fitzpatrick introduced him to Crisfield. (Hearing Tr. 120, 171) The CI told Crisfield that he had "known Pop[s] ... for years." (Hearing Tr. 174) After Crisfield showed the CI a photo-

---

**7.** Fitzpatrick did not recall that any officer threatened to break down the door, but he conceded that such a statement might have been made. (Hearing Tr. 133).

graph of Medina, the CI signed the photograph and wrote, "[T]his is the guy 'Pop' I seen shooting." (Hearing Tr. 175–76; GX 9) The interview of the CI ended at about 4:30 p.m. (Hearing Tr. 176–77).

An hour or two after Medina's arrest, Crisfield questioned Medina about the earlier incident in which he had been shot outside Scotty's. (Hearing Tr. 166, 170–71) Crisfield did not give *Miranda* warnings to Medina.[8] (Hearing Tr. 166–68, 229–32) In preparation for this interview, Crisfield had reviewed portions of the case file concerning the June 2012 shooting of Medina, and noted that Medina had not cooperated with the NYPD's investigation. (Hearing Tr. 167–68).

Crisfield told Medina that the file indicated that a man named "Bush" had shot Medina in June. (Hearing Tr. 169) Medina responded that the shooter's name was "Push." (Hearing Tr. 169) Crisfield asked Medina whether he knew anything about the shootings earlier that morning, and Medina stated that he did not. (Hearing Tr. 170) Crisfield asked Medina no further questions at that time. (Hearing Tr. 170).

At approximately 9:00 p.m., Crisfield spoke with the victim of the shooting outside Scotty's. (Hearing Tr. 177–78) The victim stated that he had not seen who had shot him. (Hearing Tr. 178).

After speaking with the victim, Crisfield entered Medina's pedigree information into an electronic database and completed arrest paperwork concerning Medina. (Hearing Tr. 179) Medina remained in the

interview room until approximately 9:30 p.m., when Crisfield took him to be fingerprinted.[9] (Hearing Tr. 179) As Crisfield escorted Medina to the fingerprint room, Medina asked what he was being charged with and why. (Hearing Tr. 179) Crisfield told Medina that he had been identified in connection with the shooting that day outside Scotty's, and that he would be charged with assault. (Hearing Tr. 180).

After fingerprints were taken, Crisfield escorted Medina back to the interview room. (Hearing Tr. 180) Crisfield told Medina that he would be brought to Central Booking and that he would not have another opportunity to speak with Crisfield. (Hearing Tr. 180) Medina then agreed to speak with Crisfield. (Hearing Tr. 180).

Because Crisfield believed that the shooting outside Scotty's and the Clark homicide might be related, he told Detectives Mullarkey and Smith—who were investigating the Clark homicide—that Medina was willing to talk. (Hearing Tr. 181, 306, 386) The three detectives entered the interview room at some point between 10:30 p.m. and 11:30 p.m., and questioned Medina for approximately one hour. (Hearing Tr. 181–83, 239, 305–06, 309).

After entering the interview room, Detective Crisfield told Medina that he needed to give him *Miranda* warnings in order for their conversation to be "official." (Hearing Tr. 181) Crisfield and Mullarkey testified that Crisfield then presented Medina with a *Miranda* advice of rights form and read a *Miranda* warning card

---

**8.** Crisfield testified that he did not give *Miranda* warnings to Medina because he was "treating [Medina] as [a] witness and victim at that point." (Hearing Tr. 166, 168, 229, 231–32) Medina was, of course, already under arrest for the shooting earlier that morning outside Scotty's.

**9.** Fitzpatrick testified that police sometimes leave an arrestee alone to "stew" for a period

of time before questioning. (Hearing Tr. 118) Crisfield acknowledged this interrogation technique, but testified that "in this instance when [detectives were] working on a nonfatal shooting and homicide, there [was] a lot of stuff going on," and the delay was not a ploy to induce Medina to answer questions. (Hearing Tr. 224–25).

aloud to Medina.[10] (Hearing Tr. 181–82, 186, 306–07) Mullarkey testified that *Miranda* warnings were read to Medina as soon as the detectives entered the interview room. (Hearing Tr. 306–307) The executed advice of rights form states that the interview of Medina commenced at 10:40 p.m. and ended at 11:45 p.m. (GX 6).

The advice of rights form provided to Medina contains the following questions:

1. You have the right to remain silent and refuse to answer questions. Do you understand question # 1?

2. Anything you do or say may be used against you in a court of law. Do you understand question # 2?

3. You have the right to consult an attorney before speaking to the police and have an attorney present during any questioning now or in the future. Do you understand question # 3?

4. If you can not afford an attorney, one will be provided for you without cost. Do you understand question # 4?

5. If you do not have an attorney available, you have the right to remain silent, until you have the opportunity to consult with one. Do you understand question # 5?

6. Now that I have advised you of your rights, are you willing to answer questions?

(GX 6).

Crisfield explained to Medina that he would be reading from his *Miranda* card

and that Medina should follow along using the *Miranda* advice of rights form. (Hearing Tr. 186) Crisfield told Medina that after each question, Crisfield would ask Medina whether he understood the question and, if so, to write "yes" next to that question and initial his answer.[11] (Hearing Tr. 186).

Both Crisfield and Mullarkey testified that Medina verbally answered "yes" to each question on the form when it was read to him, and never asked to speak with an attorney. (Hearing Tr. 187, 307–08) Medina also did not ask any questions or seek clarification concerning any aspect of the advice of rights form. (Hearing Tr. 307–08) After reading Medina the *Miranda* warnings, Crisfield told him to sign the bottom of the advice of rights form if he still wanted to speak to the detectives, and Medina did so. (Hearing Tr. 188).

On the completed advice of rights form, however, Medina wrote yes and his initials to Questions 1–4 and 6, but left the space next to Question 5 blank. (GX 6) None of the detectives noticed the omission at the time. (Hearing Tr. 247).

Crisfield then began questioning Medina about the June 2012 shooting outside Scotty's, in which Medina was shot in the leg. (Hearing Tr. 189, 309) Medina told the detectives that he had been chased and shot at by men in his neighborhood. (Hearing Tr. 189, 410) Medina stated that a man known as "Push" had shot him in

**10.** Detective Smith could not recall whether he was present when Medina was given *Miranda* warnings, but testified that he saw the signed advice of rights form. (Hearing Tr. 387).

**11.** Medina has a lengthy criminal record, which includes approximately thirteen arrests, four felony convictions—three for robbery, and one for criminal possession of marijuana in the third degree—and misdemeanor convictions for criminal mischief, theft of services, criminal contempt, criminal possession of marijuana in the fifth degree, criminal sale of marijuana in the fourth degree, and assault in the third degree, between 1996 and the July 28, 2012 arrest in the instant case. (3503-O) Accordingly, he was not a novice as to the criminal justice system.

the leg and that he had been living in constant fear since June. (Hearing Tr. 191, 410–11) Medina also stated that he had been shot at on other occasions since June. (Hearing Tr. 191, 410–11) Detective Crisfield showed Medina a photograph of Gerod Jackson, and Medina identified Jackson as "Push." (Hearing Tr. 192–93; GX 8) Medina also told the detectives that the dispute between him and his assailants arose from a debt that they owed Medina related to the sale of cocaine or crack cocaine. (Hearing Tr. 389, 412–13).

The detectives then began questioning Medina about the shootings earlier that day. Medina stated that on July 27, 2012, he observed a red Cadillac—a vehicle used by the men who had shot him—being driven in the vicinity of East 219th Street and Barnes Avenue. (Hearing Tr. 191) Medina ran away from the vehicle. (Hearing Tr. 191) At approximately 1:00 a.m. on July 28, 2012, Medina saw the same red Cadillac as it pulled up in front of Scotty's. (Hearing Tr. 191) Medina saw the driver pull a firearm out of his waistband. (Hearing Tr. 191) Medina would not tell the detectives what happened next, but he commented that he was "tired of running" and had to protect himself. (Hearing Tr. 191, 413–14).

Medina stated that he then went to 721 East 228th Street, where he observed the red Cadillac drive by several times. (GX 7) Medina reported that "Mafia"—allegedly Defendant Estrada—had hidden a gun in a nearby alley. (*Id.*) Medina saw "Push"—the man who had shot him in June—across the street. (*Id.*) Medina then heard an exchange of gunfire, and went into his girlfriend's apartment. (*Id.*) A short time later, he observed "Mafia" come down the stairs of 721 East 228th Street and exit the building. (*Id.*).

### III. POST–HEARING BRIEFING

After the hearing, Medina submitted supplemental briefing concerning his suppression motion. (Nov. 16, 2013 Def. Br. (Dkt. No. 43); Dec. 13, 2013 Def. Reply Br. (Dkt. No. 47)) Medina argues that all statements he made to detectives on July 28, 2012, should be suppressed because:

1. the detectives did not have probable cause to arrest him;

2. he was arrested inside his home, in violation of *Payton v. New York,* 445 U.S. 573 [100 S.Ct. 1371, 63 L.Ed.2d 639] (1980);

3. the NYPD interrogated him—without administering *Miranda* warnings—in the stairwell outside his girlfriend's apartment;

4. the NYPD interrogated him—without administering *Miranda* warnings—in the 47th Precinct interview room;

5. he did not knowingly waive his *Miranda* rights, as demonstrated by his "refusal" to respond to Question 5 on the advice of rights form;

6. he did not voluntarily waive his *Miranda* rights, given the length of his detention prior to questioning at the 47th Precinct;

7. even if *Miranda* warnings were administered before the three detectives began their interrogation at the 47th Precinct, the detectives employed a deliberate, two-step interrogation technique in violation of *Missouri v. Seibert,* 542 U.S. 600 [124 S.Ct. 2601, 159 L.Ed.2d 643] (2004); and

8. the detectives did not honor his repeated requests for counsel.

(*See* Nov. 16, 2013 Def. Br. (Dkt. No. 43) at 1–2).

## DISCUSSION

### I. *PROBABLE CAUSE FOR MEDI-NA'S ARREST*

Medina argues that the NYPD lacked probable cause for his arrest, and "rel[ied] on insufficient information provided by an unreliable informant." (*Id.* at 13) As a result, Medina contends, "evidence obtained during and following [his] unlawful arrest" should be suppressed "as fruit of the poisonous tree." (*Id.* at 26).

### A. *Legal Standard*

▬▬ "[A]n arrest [without a warrant] must be supported by probable cause or else it violates the Fourth Amendment." *United States v. Valentine*, 539 F.3d 88, 93 (2d Cir.2008). "[P]robable cause is 'a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules.'" *United States v. Clark*, 638 F.3d 89, 94 (2d Cir.2011) (quoting *Illinois v. Gates*, 462 U.S. 213, 232, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). "'Probable cause to arrest a person exists if the law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested.'" *Valentine*, 539 F.3d at 93 (quoting *United States v. Patrick*, 899 F.2d 169, 171 (2d Cir.1990)). "When making a probable cause determination, '[t]he experience of a [law enforcement] officer is a factor to be considered.'" *Arias v. United States*, Nos. 09 Civ. 4536(CM), 07 Cr. 813(CM), 2011 WL 1332190, at *3 (S.D.N.Y. Mar. 31, 2011) (quoting *United States v. Fisher*, 702 F.2d 372, 378 (2d Cir.1983)) (alterations in original).

▬▬ "'Probable cause [does not] require[ ] . . . a prima facie showing of criminal activity. . . . Rather, it requires only the possibility of criminal activity. . . .'" *United States v. Rodriguez*, No. S107 Cr. 699(HB), 2008 WL 52917, at *5 (S.D.N.Y. Jan. 2, 2008) (quoting *United States v. Perea*, 848 F.Supp. 1101, 1104 (E.D.N.Y. 1994)). "The quantum of evidence required to establish probable cause to arrest need not reach the level of evidence necessary to support a conviction, but it must constitute more than rumor, suspicion, or even a 'strong reason to suspect.'" *Fisher*, 702 F.2d at 375 (quoting *Henry v. United States*, 361 U.S. 98, 101, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959)) (internal citations omitted). "[A] showing of probable cause cannot be negated simply by demonstrating that an inference of innocence might also have been drawn from the facts alleged." *Walczyk v. Rio*, 496 F.3d 139, 157 (2d Cir.2007).

▬▬ Where information from a confidential informant provides the basis for an arrest, courts undertake "the totality-of-the-circumstances analysis that traditionally has informed probable cause determinations." *Gates*, 462 U.S. at 238, 103 S.Ct. 2317; *see Caldarola v. Calabrese*, 298 F.3d 156, 162–63 (2d Cir.2002) (applying the totality-of-the-circumstances analysis to determine whether informant tips provided probable cause for an arrest). "[A]n informant's 'veracity,' 'reliability' and 'basis of knowledge' are all highly relevant in determining the value of [the informant's] report." *Gates*, 462 U.S. at 230, 103 S.Ct. 2317. These factors should not, however, "be understood as entirely separate and independent requirements to be rigidly exacted in every case. . . . Rather, . . . they should be understood simply as closely intertwined issues that may usefully illuminate the commonsense, practical question [of] whether there is 'probable cause.' . . ."

*Id.* "If, for example, a particular informant is known for the unusual reliability of his predictions of certain types of criminal activities in a locality, his failure, in a particular case, to thoroughly set forth the basis of his knowledge surely should not serve as an absolute bar to a finding of probable cause based on his tip." *Id.* at 233, 103 S.Ct. 2317. "Conversely, even if [a court] entertain[s] some doubt as to an informant's motives, his explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed first-hand, entitles his tip to greater weight than might otherwise be the case." *Id.*

The Second Circuit has noted that

[t]he core question in assessing probable cause based upon information supplied by an informant is whether the information is reliable. Information may be sufficiently reliable to support a probable cause finding if the person providing the information has a track record of providing reliable information, or if it is corroborated in material respects by independent evidence. If a substantial amount of information from an informant is shown to be reliable because of independent corroboration, then it is a permissible inference that the informant is reliable and that therefore other information that he provides, though uncorroborated, is also reliable.

*United States v. Wagner,* 989 F.2d 69, 72–73 (2d Cir.1993).

## B. *Analysis*

 The decision to arrest Medina was made by Lieutenant Fitzpatrick, an officer with more than nineteen years' experience in the NYPD. (Hearing Tr. 15).

Fitzpatrick supervised the investigation of the July 28, 2012 shooting outside Scotty's and the Clark homicide. Fitzpatrick and his detectives went to the scene of each shooting, reviewed video footage of the Clark homicide, canvassed the neighborhood where the Clark homicide had taken place, and questioned Medina, who lived in an apartment building adjacent to the site of the Clark homicide. Fitzpatrick also examined the red Cadillac at the scene of the Clark homicide, and observed bullet holes on the passenger side of the car.

Fitzpatrick then questioned a confidential informant about the two shootings. Fitzpatrick had been working with the CI for about eight months, and he knew that the CI was familiar with the neighborhoods in which the shootings had taken place. (Hearing Tr. 37–38, 43–45) The CI had provided information to Fitzpatrick in the past that Fitzpatrick had been able to corroborate. (Hearing Tr. 128) This "track record" of reliable information made it more likely that the information the CI provided to Fitzpatrick on July 28, 2012, was reliable. *See Wagner,* 989 F.2d at 72–73.

Moreover, the CI's description of events in the early morning hours of July 28, 2012, in front of Scotty's was corroborated by other information the NYPD had uncovered during its investigation. The CI described seeing someone shoot at a red Cadillac on the passenger side of the car, an account that was consistent with Fitzpatrick's observation of bullet holes on the red Cadillac at the scene of the Clark homicide. (Hearing Tr. 40) The CI also stated that a bystander had been shot down the street from Scotty's; this account was likewise consistent with other information obtained by the NYPD. (Hearing Tr. 40) The CI reported that Defendant Estrada—who the police had seen in the videotape firing shots at the scene of the Clark homicide—was with Medina, a/k/a "Pops," outside Scotty's when the bystander was shot. (Hearing Tr. 131)

Because a number of the details provided by the CI were consistent with and corroborated by the NYPD's independent investigation, there was reason to believe that the CI's claim that the shooter outside Scotty's had been shot himself at that same location earlier in the summer was reliable.[12] *See United States v. Gagnon*, 373 F.3d 230, 236 (2d Cir.2004) ("In addition to considering an informant's veracity, reliability, and basis of knowledge, in assessing the totality of the circumstances we also evaluate whether the information an informant provides is corroborated by independent police investigation . . ."); *see Wagner*, 989 F.2d at 72–73.

Moreover, Fitzpatrick—who had encountered Medina early on during his investigation of the July 28, 2012 shootings—recognized him as the victim of a shooting two months earlier outside Scotty's. (Hearing Tr. 35, 75) Fitzpatrick also knew that (1) Clark had been shot to death across the street from the apartment building in which Medina was living; and (2) a resident of 721 East 228th Street had reported that the apartment in which Medina was living was connected to the Clark homicide. (Hearing Tr. 32) This information, considered together with the CI's information and identification, provided Fitzpatrick with "sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing" that Medina had been involved in an altercation with the driver of the red Cadillac, and that Medina had fired the shots that struck the red Cadillac and the

bystander outside Scotty's. *Valentine*, 539 F.3d at 93. Accordingly, Medina's arrest was supported by probable cause, and his statements will not be suppressed on this ground.

## II. MANNER OF MEDINA'S ARREST

Medina argues that the investigative fruits of his arrest should be suppressed because the police arrested him inside his home without a warrant, in violation of *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). (Nov. 16, 2013 Def. Br. (Dkt. No. 43) at 20–27) Medina claims that he was forcibly removed from his home and arrested or, alternatively, that the NYPD's show of force effectively amounted to an arrest inside his home. (*Id.* at 22, 24).

### A. Legal Standard

"It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton*, 445 U.S. at 586, 100 S.Ct. 1371. "In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house." *Payton*, 445 U.S. at 590, 100 S.Ct. 1371. Accordingly, "absent exigent circumstances or consent, the police must obtain a warrant before entering a suspect's home to make a routine felony arrest." *Mosby v. Senkowski*, 470 F.3d 515, 519 (2d Cir.2006).

---

**12.** Medina argues that the CI's criminal record and outstanding bench warrants require a finding of unreliability. (Nov. 16, 2013 Def. Br. (Dkt. No. 43) at 18–19) These factors are not dispositive, however, given the reliable information that the CI had provided in the past, his first-hand knowledge of the shooting outside Scotty's, and the details and observations he provided about the shooting that were corroborated by Lieutenant Fitzpatrick's

observations and the ongoing NYPD investigation. *Cf. United States v. Fermin*, 32 F.3d 674, 676–77 (2d Cir.1994) (finding informant who was discussed in wiretap application reliable, despite misstatements and omissions in the supporting affidavit regarding informant's criminal history, where informant had provided reliable information in the past and his account was corroborated by other evidence described in the affidavit).

## B. *Analysis*

▮ Fitzpatrick and Mullarkey testified that Medina came out of his girlfriend's apartment voluntarily when the officers arrived to arrest him, and that he was arrested in the hallway. (Hearing Tr. 46, 113–14, 302, 336) Crisfield's equivocal testimony that he "thought" Medina was brought out by officers does not overcome Fitzpatrick and Mullarkey's definitive statements on this point, especially given that Fitzpatrick was stationed closest to the door. (*See* Hearing Tr. 113–14, 162) Fitzpatrick and Mullarkey's testimony supports a conclusion that no *Payton* violation occurred at the time of Medina's arrest.[13]

Medina argues, however, that even if the Court finds that no physical entry of the apartment occurred, the NYPD "effectively seized Mr. Medina inside the home" through a show of force at the door. (Nov. 16, 2013 Def. Br. (Dkt. No. 43) at 25).

"Although some courts in other circuits have found that *Payton* might apply where the police use an extreme degree of coercion or fraud in coaxing a suspect out of their home, the Second Circuit has never held that such conduct amounts to a *Payton* violation, and other circuits have rejected such an application of *Payton*."

*Watkins v. Perez,* No. 05 Civ. 477(GEL), 2007 WL 1344163, at *10 (S.D.N.Y. May 7, 2007) ("[E]ven if the police make it clear that a suspect cannot leave her home without being arrested, such conduct does not implicate the concerns that motivated *Payton.... Payton* is not implicated simply because petitioner was technically 'seized' while within her home.") (internal citations omitted).

Even if coercive conduct without a physical entry could amount to a *Payton* violation, the NYPD's conduct here is distinguishable from the extreme examples cited by Medina. For example, in *Sharrar v. Felsing,* 128 F.3d 810, 819 (3d Cir.1997), "a SWAT team surround[ed] a residence with machine guns pointed at the windows and the persons inside [were] ordered to leave the house backwards with their hands raised." Likewise, in *United States v. Maez,* 872 F.2d 1444, 1450 (10th Cir.1989), "[t]he Albuquerque SWAT team had surrounded the [defendant's] trailer with rifles pointed at the home[,] [used] ... loud speakers [to ask] the occupants '... to remove themselves from the mobile home' ..., [had] rifles pointed at the house[,] and ... searched and handcuffed [the defendant's son outside, which the defendant witnessed]." In *United States v. Al–Azzawy,* 784 F.2d 890, 893 (9th Cir.1985),

---

**13.** In considering Medina's claim that he was forcibly removed from his girlfriend's apartment, this Court has weighed both Medina's affidavit and the officers' testimony. As a general matter, credible testimony at a hearing is entitled to more weight than an affidavit, because testimony has been subjected to cross-examination. *See, e.g., United States v. Fuentes,* No. 07 Cr. 329(SHS), 2007 WL 2319142, at *4 (S.D.N.Y. Aug. 10, 2007) (crediting hearing testimony over defendant's affidavit regarding whether he gave consent to search); *United States v. Robles,* 253 F.Supp.2d 544, 549 n. 14 (S.D.N.Y.2002) ("[C]ourts 'give greater weight to [witness] testimony, which was subject to cross examination, than to [sworn] affidavits.' ") (quoting

*United States v. Gardner,* 611 F.2d 770, 774 n. 2 (9th Cir.1980)) (second and third alterations in original); *United States v. Long Huang You,* 198 F.Supp.2d 393, 400–01 n. 8 (S.D.N.Y. 2002) (same); *United States v. Juliano,* No. 99 Cr. 1197(AGS), 2000 WL 1206745, at *3 n. 1 (S.D.N.Y. Aug. 24, 2000) (affording less weight to defendant's affidavit, because the court could not assess the defendant's credibility and the testimony of Government witnesses was "forthright and truthful"); *United States v. Frank,* 8 F.Supp.2d 284, 291 n. 2 (S.D.N.Y.1998) (crediting hearing testimony over defendant's affidavit because the affidavit was not subject to cross examination and the testifying witnesses were credible).

"the police had completely surrounded [defendant's] trailer with their weapons drawn and ordered him through a bullhorn to leave the trailer and drop to his knees." In each case, the court concluded that the defendant was essentially arrested within the home because of the extreme showing of force by law enforcement. Nothing comparable to the force used in these cases occurred here.

■■ Finally, even if a *Payton* violation had occurred, it would not warrant suppression of Medina's post-arrest statements. The Supreme Court has "decline[d] to apply the exclusionary rule in this context because the rule in *Payton* was designed to protect the physical integrity of the home; it was not intended to grant criminal suspects . . . protection for statements made outside their premises where the police have probable cause to arrest the suspect for committing a crime." *New York v. Harris*, 495 U.S. 14, 17, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990). Accordingly, "where the police have probable cause to arrest a suspect, the exclusionary rule does not bar the . . . use of a statement made by the defendant outside of his home, even though the statement is taken after an arrest made in the home in violation of *Payton*." *Id.* at 21, 110 S.Ct. 1640.

Because the NYPD had probable cause to arrest Medina, the exclusionary rule would not apply to his post-arrest statements, even if a *Payton* violation had occurred. Accordingly, Medina's post-arrest statements will not be suppressed on this basis.

### III. ALLEGED MIRANDA VIOLATIONS

Medina contends that *Miranda* violations require suppression of statements he made (1) while in the stairwell of his girlfriend's apartment building, prior to his arrest, and (2) when questioned by Detectives Crisfield, Smith, and Mullarkey at the 47th Precinct on the night of his arrest. (Nov. 16, 2013 Def. Br. (Dkt. No. 43) at 30–61).

### A. *Legal Standard: Miranda Requirements*

In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court held that

> when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning . . . [the following] [p]rocedural safeguards must be employed to protect the privilege [against self-incrimination:] . . . He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him.

*Id.* at 478–79, 86 S.Ct. 1602.

■■ "A central inquiry in determining whether *Miranda* is applicable is thus whether the statement of the defendant that is at issue was made in the course of 'custodial interrogation.'" *United States v. Rodriguez*, 356 F.3d 254, 258 (2d Cir. 2004).

"Custodial interrogation exists when a law enforcement official questions an individual and that questioning was (1) conducted in custodial settings that have inherently coercive pressures that tend to undermine the individual's will to resist and to compel him to speak (the in custody requirement) and (2) when the inquiry is conducted by officers who are aware of the potentially incriminatory nature of the disclosures sought (the investigative intent requirement)."

*Id.* (quoting *United States v. Morales,* 834 F.2d 35, 38 (2d Cir.1987)) (internal citations omitted).

With respect to custody, the Supreme Court has noted that,

[a]s used in [its] *Miranda* case law, "custody" is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion. In determining whether a person is in custody in this sense, the initial step is to ascertain whether, in light of "the objective circumstances of the interrogation," a "reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." And in order to determine how a suspect would have "gauge[d]" his "freedom of movement," courts must examine "all of the circumstances surrounding the interrogation." Relevant factors include the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning.

*Howes v. Fields,* —— U.S. ——, 132 S.Ct. 1181, 1189, 182 L.Ed.2d 17 (2012) (quoting *Stansbury v. California,* 511 U.S. 318, 322–323, 325, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994); *Thompson v. Keohane,* 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995)) (internal citations omitted).

■ "Interrogation"—for purposes of *Miranda*—"refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).

■ "The purpose of the *Miranda* warning is to ensure that the person in custody has sufficient knowledge of his or her constitutional rights relating to the interrogation and that any waiver of such rights is knowing, intelligent, and voluntary." *United States v. Carter,* 489 F.3d 528, 534 (2d Cir.2007). However,

[a]ny statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. . . . Volunteered statements of any kind are not barred by the Fifth Amendment. . . .

*Miranda,* 384 U.S. at 478, 86 S.Ct. 1602.

■ Where a defendant "has alleged police custodial interrogation in the absence of *Miranda* warnings, the burden shifts to the government to prove *Miranda* voluntariness, either because there was no custodial interrogation implicating *Miranda,* there was some exception to the *Miranda* rule, or because [the defendant] was properly *Mirandized* and waived his rights." *United States v. Miller,* 382 F.Supp.2d 350, 362 (N.D.N.Y.2005).

■ "To prove a valid waiver [of *Miranda* rights], the government must show (1) that the relinquishment of the defendant's rights was voluntary, and (2)

that the defendant had a full awareness of the right being waived and of the consequences of waiving that right." *United States v. Jaswal,* 47 F.3d 539, 542 (2d Cir.1995) *(per curiam ).* "Only if the totality of the circumstances 'reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.'" *United States v. Male Juvenile,* 121 F.3d 34, 40 (2d Cir.1997) (quoting *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)). "The government bears the burden of demonstrating by a preponderance of the evidence that a defendant waived his constitutional rights." *United States v. Lynch,* 92 F.3d 62, 65 (2d Cir.1996).

■ Voluntariness is evaluated in light of "the totality of all the surrounding circumstances, including the accused's characteristics, the conditions of interrogation, and the conduct of law enforcement officials" to determine whether "the defendant's will was overborne by the [police officers'] conduct." *United States v. Anderson,* 929 F.2d 96, 99 (2d Cir.1991); *see Lynch,* 92 F.3d at 65 (applying this analysis to determine "[w]hether a defendant knowingly and voluntarily waived his rights").

■ "A voluntary relinquishment of a right occurs when the relinquishment is the 'product of a free and deliberate choice rather than intimidation, coercion, or deception.'" *Male Juvenile,* 121 F.3d at 41 (quoting *Moran,* 475 U.S. at 421, 106 S.Ct. 1135). "Coercive police activity [therefore] is 'a necessary predicate' to finding that a waiver of *Miranda* rights was not voluntary." *Coronado v. Lefevre,* 748 F.Supp. 131, 139 (S.D.N.Y.1990) (quoting *Colorado v. Connelly,* 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986)).

■ A waiver of *Miranda* rights is "knowing" if the "the relinquishment of rights was ... 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *United States v. Plugh,* 648 F.3d 118, 127 (2d Cir.2011) (quoting *Moran,* 475 U.S. at 421, 106 S.Ct. 1135).

### B. *The Stairwell Interrogation*

■ Medina argues that his rights were violated when detectives questioned him in the stairwell outside his girlfriend's apartment without reading him *Miranda* warnings. Because Medina was not "in custody" at this time, there was no *Miranda* violation.

The detectives present at the stairwell encounter all testified that Medina was free to leave at any time. Medina was not surrounded by officers, was not handcuffed or physically restrained, and was not told that he could not leave. Although Medina was not permitted to return to his girlfriend's apartment while his girlfriend was being questioned, the record demonstrates that Medina's movements were not otherwise restrained.

Moreover, the questioning of Medina— which Detective Smith characterized as "casual" and "amicable"—consisted of a request for basic pedigree information and for any information that Medina had about the shooting that occurred outside his girlfriend's apartment building. Medina stated that he had been in the lobby of the building and had seen nothing. The entire conversation lasted about ten minutes, at which point the detectives left and Medina returned to his girlfriend's apartment.

A reasonable person would have felt free to leave the stairwell under these circumstances, and the NYPD's encounter with Medina presents no "serious danger of coercion." *See Howes,* 132 S.Ct. at 1189.

Because Medina was not "in custody," no *Miranda* warnings were required, and the statements Medina made during this encounter will not be suppressed on the basis of a *Miranda* violation.

### C. Post–Arrest Questioning of Medina

Medina also claims that post-arrest statements he made at the 47th Precinct must be suppressed because (1) he was not read *Miranda* warnings before he was questioned; (2) he did not knowingly waive his rights, as demonstrated by his "refusal" to answer and initial "Question 5" on the advice of rights form; (3) the length of his detention rendered any waiver involuntary; and (4) his statements were procured through an unlawful two-step interrogation technique. (*See* Nov. 16, 2013 Def. Br. (Dkt. No. 43) at 30–61).

### 1. Whether Medina Received Miranda Warnings Before Questioning

 Medina claims that he was not read *Miranda* warnings before he was questioned by the three detectives at the 47th Precinct.[14] (*Id.* at 30–44) According to Medina, after eight hours of detention, three detectives entered the interview room and questioned him for an hour before giving him *Miranda* warnings. (Medina Aff. ¶ 15) After this interrogation, Detective Crisfield read *Miranda* warnings to Medina and instructed him to sign the advice of rights form. (*Id.* ¶ 16) The detectives then asked additional questions about a particular phone number and a man shown in a photograph displayed to Medina. (*Id.* ¶ 18).

The Court concludes that the Government has met its burden of demonstrating by a preponderance of the evidence, *see Lynch,* 92 F.3d at 65, that *Miranda* warnings were given to Medina before he was questioned by the three detectives. Both Detectives Crisfield and Mullarkey testified that Medina was given *Miranda* warnings before he was questioned about the July 28, 2012 shootings. Both detectives also testified in detail about how Crisfield read each *Miranda* warning to Medina one by one, and how Medina answered "yes" as to each question. This Court finds their testimony credible. Moreover, aspects of Medina's account are not credible. For example, it would make no sense for the detectives to interrogate Medina, then administer *Miranda* warnings, and then ask Medina additional questions. Finally, the detectives' testimony on this point is entitled to more weight than Medina's affidavit, because—as previously discussed—it was subject to cross-examination and the detectives gave consistent testimony and appeared credible.

Accordingly, Medina's post-arrest statements will not be suppressed on the grounds that he was not given *Miranda* warnings until after he made these statements.

### 2. Failure to Respond to Question 5

 Medina claims that his failure to respond to Question 5 on the advice of rights form demonstrates that he did not knowingly waive his rights. (Nov. 16, 2013 Def. Br. (Dkt. No. 43) at 58–60) Question 5 reads: "If you do not have an attorney available, you have the right to remain silent, until you have the opportunity to

---

**14.** The Government has represented that it will not seek to introduce any of Medina's statements to Detective Crisfield during their one-on-one encounter at the 47th Precinct. (Hearing Tr. 442–43; Nov. 16, 2013 Def. Br. (Dkt. No. 43) at 38) The Court considers be-

low, however, whether Crisfield's admittedly un-Mirandized questioning of Medina about the June 2012 shooting outside Scotty's violates *Missouri v. Seibert,* 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004).

consult with one. Do you understand question # 5?" (GX 6) Detectives Crisfield and Mullarkey testified that Medina verbally answered "yes" to each question on the advice of rights form, and that none of the detectives noticed that he had not written a response to Question 5 on the advice of rights form. According to Medina, he intentionally "refused to acknowledge item '5,'" and his refusal demonstrates that he did not fully understands his rights and/or did not waive his rights. (Medina Aff. ¶ 17; Nov. 16, 2013 Def. Br. (Dkt. No. 43) at 58–59) This Court concludes that the Government has demonstrated that it is more likely than not the case that Medina's failure to print a response to Question 5 was an inadvertent oversight.

 As an initial matter, and as discussed above, Detectives Crisfield and Mullarkey offered credible testimony that all six questions on the advice of rights form were read to Medina, and that he verbally answered "yes" to each question. Written confirmation of a verbal waiver is, of course, not required. *See, e.g., North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979) ("An express written or oral statement of waiver of the right to remain silent or of the right to counsel . . . is not inevitably either necessary or sufficient to establish waiver. The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case."); *United States v. Frank*, 8 F.Supp.2d 284, 302 (S.D.N.Y. 1998) ("[A] defendant can be found to have waived the right to counsel despite refusing to sign a waiver form.)"

Moreover, Medina wrote "yes" and signed his initials next to five of the six questions on the advice of rights form, including Question 3, which is very similar to Question 5. Question 3 states: "You have the right to consult an attorney before speaking to the police and have an attorney present during questioning now or in the future. Do you understand question # 3?" (GX 6) Question 5 states: "If you do not have an attorney available, you have the right to remain silent, until you have the opportunity to consult with one. Do you understand question # 5?" (GX 6) Both Questions 3 and 5 informed Medina that he had the right to remain silent until he had had the opportunity to consult with an attorney. (GX 6) Given that Medina understood Question 3—as indicated by the word "yes" he wrote next to Question 3—and given that he did not ask any questions or express any confusion about Question 5, or raise any objection to it, it is not credible for him to suggest that he did not understand Question 5 and did not intend to waive this right. Indeed, it is far more likely that his failure to answer Question 5 was simply an oversight.

The configuration of the advice of rights form lends itself to skipping over the line for a response to Question 5. There is a gap of 2/8 to 3/8 of an inch between the response lines for the other questions on the form. For Question 5, the space within which to write a response is 1/8 of an inch. (*See* GX 6) Under all the circumstances, this Court concludes that Question 5 was read to Medina, that he told the detectives that he understood this right, and that his failure to answer Question 5 in writing does not reflect a failure of understanding or an objection to Question 5, but simply an oversight. Given Medina's verbal answers and his written answers to the other questions on the advice of rights form, this Court concludes that Medina understood his rights but nonetheless agreed to answer the detectives' ques-

tions.[15]

### 3. *Length of Detention*

 Medina argues that being "in police custody, and largely incommunicado, for over seven hours [before] the start of the final interrogation" "rendered his waiver [and subsequent statements] involuntary." (Nov. 16, 2012 Def. Br. (Dkt. No. 43) at 57–61).

While it is undisputed that Medina was in custody for seven to eight hours before Detective Crisfield and his two colleagues provided *Miranda* warnings and obtained Medina's oral and written waiver (*see id.*; Govt. Br. (Dkt. No. 46) at 9–10, 12), this fact is not dispositive as to whether his waiver was valid. Other courts in this Circuit have upheld waivers despite even longer delays. *See Maldonado v. Greiner*, No. 01 Civ. 0799(KMW)(AJP), 2003 WL 22435713, at *33 (S.D.N.Y. Oct. 28, 2003) (waiver voluntary where "[the defendant] was in the precinct for about twelve hours before receiving *Miranda* warnings"); *Bastidas v. Henderson*, 664 F.Supp. 51, 53–54 (E.D.N.Y.1987), *aff'd*, 842 F.2d 1287 (2d Cir.1988) (waiver found even though defendant had been held at the police station for ten hours before *Miranda* warnings were given); *see also United States v. Heron*, 564 F.3d 879, 881–82, 886–87 (7th Cir.2009) (finding voluntary waiver where *Miranda* warnings were not administered until more than thirty-two hours after arrest).

The circumstances here support a finding that Medina's waiver was voluntary, despite the period of time he had been held in custody. Medina does not contend that he was threatened or coerced by the police, or that he was the subject of brutality, psychological duress, or unduly prolonged interrogation. Medina's handcuffs were removed once he was placed in the interview room; he was fed; he was given a coat when he complained that he was cold; and he was taken to the bathroom as necessary. All of these facts weigh in favor of a finding of voluntariness. *See United States v. Juvenile Male*, 968 F.Supp.2d 490, 509–10 & n. 10 (E.D.N.Y. 2013) (waiver voluntary where defendant was detained in precinct interview room for "many hours," but detectives did not engage in repeated or prolonged questioning, defendant was permitted to use the bathroom, defendant was given the opportunity to eat and drink, and defendant's handcuffs were periodically removed); *United States v. Guzman*, 879 F.Supp.2d 312, 317–18, 326 (E.D.N.Y.2012) (juvenile's waiver voluntary where he was handcuffed to a bench for approximately four hours after his arrest but was offered food and drink and allowed to use the bathroom); *see also Amaya–Ruiz v. Stewart*, 121 F.3d 486, 494–95 (9th Cir.1997) (waiver voluntary after nine hours of detention where there was a bench on which defendant could sleep, defendant was given coffee and food, and the interrogating officers were calm and not threatening).

Finally, it was after fingerprinting and processing—and in response to Detective Crisfield's comment that Medina would shortly be transferred to Central Booking—that Medina stated that he would answer questions. Medina's decision to answer questions was not the product of repeated badgering by Crisfield or other detectives. Instead, it was a response to

---

**15.** *United States v. Scott*, 624 F.Supp.2d 279, 283 (S.D.N.Y.2008), cited by Medina, is distinguishable. In *Scott*, the defendant was read *Miranda* warnings and verbally stated that he was willing to answer questions. The defendant wrote "no" on the advice of rights form, however, when asked whether he was willing to answer questions. Here, Medina never stated during the interrogation conducted by the three detectives—either verbally or in writing—that he did not wish to answer questions.

Crisfield's observation that Medina was about to be transferred to Central Booking, and that if he wished to make a statement to Crisfield, the time within which to do that was coming to an end.

Under the totality of the circumstances, it cannot be said that Medina's will was overborne, or that his waiver was involuntary. Accordingly, the Court concludes that both Medina's waiver and the statements he made were voluntary.

#### 4. *Two–Step Interrogation*

Medina argues that his post-arrest statements should be suppressed because they were obtained as the result of a deliberate two-stage interrogation in violation of *Missouri v. Seibert*, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004) (plurality opinion). (Nov. 16, 2013 Def. Br. (Dkt. No. 43) at 45–57) Medina points to two encounters with the NYPD as constituting "first stage" interrogation: (1) the questioning at the stairwell outside his girlfriend's apartment; and (2) Detective Crisfield's one-on-one questioning at the 47th Precinct. (*Id.* at 48–51) Having determined that Medina was not "in custody" at the stairwell, and that *Miranda* warnings were therefore not required, this Court will only address that aspect of Medina's *Seibert* argument that is based on Detective Crisfield's one-on-one questioning of Medina.

##### a. *Legal Standard: Two–Stage Interrogation*

The Supreme Court addressed two-stage interrogation in *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), and *Missouri v. Seibert*, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004) (plurality opinion). "*Elstad* involved a situation in which a suspect made a [pre-*Miranda*] self-incriminating statement while two police officers were at his home investigating a robbery." *United States v. Capers*, 627 F.3d 470, 474 (2d

Cir.2010). "The officers transported the suspect to a police station where they gave him a *Miranda* warning prior to obtaining both an oral and written confession." *Id.* "[When] the defendant moved to suppress the postwarning confessions ... [t]he Supreme Court ... held that '[t]hough *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.'" *Id.* (quoting *Elstad*, 470 U.S. at 309, 105 S.Ct. 1285). Finding that "the police did not employ any coercive tactics to elicit either confession and that the defendant made his postwarning confession voluntarily ... [t]he Court concluded that 'the dictates of *Miranda* and the goals of the Fifth Amendment proscription against use of compelled testimony [were] fully satisfied in the circumstances of th[e] case.'" *Id.* at 475–76 (quoting *Elstad*, 470 U.S. at 318, 105 S.Ct. 1285).

"Whereas *Elstad* involved a good-faith effort by the police to administer a proper *Miranda* warning, *Seibert* addressed the use of a two-step interrogation strategy designed to elicit a post-*Miranda* waiver and confession after the defendant had already confessed before he was given *Miranda* warnings." *Id.* at 475. "In *Seibert*, the Supreme Court found unconstitutional 'a police protocol for custodial interrogation that call[ed] for giving no warnings of the rights to silence and counsel until interrogation ha[d] produced a confession.'" *United States v. Williams*, 681 F.3d 35, 40 (2d Cir.2012) (quoting *Seibert*, 542 U.S. at 604, 124 S.Ct. 2601). Under this protocol, "arresting officers were taught to intentionally omit *Miranda* warnings until their interrogation produced a confession, administer the warnings, and then question the defendant based on his pre-*Miranda*

confession, in order to get him to restate it." *Id.* at 38.

■■■ The Second Circuit has characterized *Seibert* as "lay[ing] out an exception to *Elstad* for cases in which a deliberate, two-step strategy was used to obtain [a] postwarning confession." *Id.* at 41. "[A] court should review 'the totality of the objective and subjective evidence surrounding the interrogations in order to determine deliberateness.'" *Id.* (quoting *Capers,* 627 F.3d at 479). Because "'the intent of the officer will rarely be ... candidly admitted[,]' ... [the Second Circuit has] recogni[zed] that in most instances the inquiry will rely heavily, if not entirely, upon objective evidence." *Capers,* 627 F.3d at 479 (quoting *Seibert,* 542 U.S. at 616 n. 6, 124 S.Ct. 2601). "[T]he Government bears the burden of disproving by a preponderance of the evidence that it employed a deliberate two-step strategy." *Williams,* 681 F.3d at 41.

■■■ With respect to objective evidence, courts "are guided by, but not limited to, ... five factors identified by the plurality in *Seibert.*" *Id.* at 44. These factors include:

(1) "the completeness and detail of the questions and answers in the first round of interrogation," (2) "the overlapping content of the two statements," (3) "the timing and setting of the first and the second," interrogations, (4) "the continuity of police personnel" doing the questioning, and (5) "the degree to which the interrogator's questions treated the second round as continuous with the first."

*United States v. Moore,* 670 F.3d 222, 228 (2d Cir.2012) (quoting *Seibert,* 542 U.S. at 615, 124 S.Ct. 2601).

■■■ As to subjective evidence of intent, a court should conduct "a somewhat closer scrutiny of an investigator's testimony ... when the proffered rationale is not a 'legitimate' reason to delay or where it 'inherently lacks credibility' in view of the 'totality of the circumstances.'" *Id.* at 229 (quoting *Capers,* 627 F.3d at 484 n. 5) "Such scrutiny is not ordinarily required when the reason for delay is legitimate, such as officer or community safety or when delay is a product of a 'rookie mistake,' miscommunication, or 'a momentary lapse in judgment.'" *Id.* (quoting *Capers,* 627 F.3d at 484 n. 5). "Moreover, if it is found, after weighing the investigator's credibility, that the investigator's intent was not 'calculated ... to undermine *Miranda,*' delay will not require exclusion of the later, warned statement even if the court finds that the delay was for an illegitimate reason and even in the absence of curative measures." *Id.* (quoting *Capers,* 627 F.3d at 482) (alteration in original); *see also Williams,* 681 F.3d at 43–44.

**b. *Application***

■■■ As an initial matter, it must be acknowledged that the conduct at issue here does not involve "[t]he quintessential two-step [interrogation] technique [at issue in *Seibert* ]." *Williams,* 681 F.3d at 45. Medina was not given *Miranda* "'warnings only in the aftermath of interrogation and just after making a confession,' with the police 'leading him over the same ground again'" in a second interrogation. *Id.* (quoting *Seibert,* 542 U.S. at 613, 124 S.Ct. 2601). Medina did not confess to committing a shooting on July 28; to the contrary, he denied any knowledge of the July 28 shootings. *See Carter,* 489 F.3d at 536 ("This stands in stark contrast to the *Seibert* case, where the defendant gave a full confession before receiving the [*Miranda* ] warning and then was essentially cross-examined about her confession into a tape recorder after having been given the warning.").

As to the objective and subjective factors discussed in *Seibert* and its progeny, the objective evidence here does not indicate that Detective Crisfield engaged in a deliberate two-stage interrogation. As to "the completeness and detail of the questions and answers in the first round of interrogation," and the "overlapping content of the two statements," Crisfield's one-on-one questioning of Medina concerned almost exclusively the June 2012 shooting in which Medina was a victim. Medina merely confirmed information that he had provided to the NYPD in June 2012, correcting the record to the extent that the file indicated that the shooter was "Bush" rather than "Push." Medina denied knowing anything about the shootings on July 28 and did not provide any information concerning these shootings. (Hearing Tr. 169–70) In contrast, the focus of the second interview was on the July 28 shootings. (*See* GX 7) Medina provided a detailed account of the sequence of events on July 28, 2012, and his role in those events—matters which he had not discussed at all with Detective Crisfield during the earlier interview. (*See id.*) In sum, there is little overlap between the two statements, and the detail in the first interrogation is not comparable to the detail of the second statement.

As to the remaining objective factors, while Crisfield's one-on-one interview and the later interrogation conducted by Crisfield and his two colleagues took place in the same interview room at the 47th Precinct, the two interviews were separated by several hours. There was likewise not continuity of personnel; Crisfield was alone at the first interview, but was joined by two other detectives at the second interview. The significant break in time and the difference in personnel weigh against a finding of deliberateness. *See Williams*, 681 F.3d at 44–45.

As to "the degree to which the interrogator's questions treated the second round as continuous with the first," the second interrogation began with questions about the June 2012 shooting in which Medina was a victim. Medina repeated that he had been shot by "Push," and added that he had been shot at on other occasions since June. (Hearing Tr. 191, 410–11) Medina also explained that the dispute between himself and his assailants was related to drug trafficking. (Hearing Tr. 389, 412–13) The detectives' questioning then turned to the shootings that day, however, and remained focused on that issue. (Hearing Tr. 191).

A consideration of the objective factors does not suggest that the detectives engaged in conduct that runs afoul of *Seibert* and its progeny. Medina did not provide any information concerning the July 28 shootings to Detective Crisfield at the earlier interview, and there was no confession or admission of wrongdoing concerning the July 28 shootings in Crisfield's initial interrogation. Moreover, the limited information Medina did provide concerning the June 2012 shooting—in which he was a victim—was already in the NYPD's file, albeit with the shooter as "Bush" rather than "Push." Finally, "the narrowness of overlap between the subjects of the two interrogations, the participation of different officers, and the elapse of [time] between the interrogations . . . points against concluding that the government engaged in a deliberate two-step process designed to undermine [Medina's] Fifth Amendment rights." *Moore*, 670 F.3d at 231.

As to subjective factors, there is no direct evidence "of an intent to use a two-step technique, nor any evidence that such intent was reflected in a police report." *Id.* at 230. To the contrary, Crisfield testified that he did not administer *Miranda*

warnings to Medina at the first interview because he was "treating [Medina] as witness and victim at that point." (Hearing Tr. 166–68, 229, 231–32) Whatever Crisfield's view as to Medina's status, however, the fact is that Medina was under arrest for the July 28 shooting outside Scotty's. Given that Medina was in custody and that Crisfield intended to question him, *inter alia*, about the July 28 shooting outside Scotty's, it seems apparent that *Miranda* warnings should have been administered. Accordingly, consideration of subjective factors weighs in favor of a finding of deliberateness.

Considering the totality of the objective and subjective evidence, this Court concludes that Medina's admissions during the second interrogation were not the product of a deliberate, two-step interrogation technique. Critical to the Court's determination is the fact that Medina made no admissions concerning the July 28 shootings during Crisfield's initial interrogation. The later interrogation did not involve a re-plowing of ground already plowed by Crisfield. Moreover, the information Crisfield discussed with Medina during the first interview was already known to the NYPD, as a result of detectives' earlier investigation of the June 2012 shooting. For these reasons, the detectives' conduct does not require suppression under *Seibert* and the Second Circuit cases that have interpreted *Seibert*.

\*　　\*　　\*

The Court further concludes that Medina's statements to the three detectives during the second interview at the 47th Precinct were voluntary. As found above, Medina was advised of his rights before the later interrogation and he agreed both orally and in writing to waive his rights. There is no allegation that Medina's statements during the second interrogation were the product of brutality, psychological pressure, threats, or unduly prolonged interrogation. *See Moore*, 670 F.3d at 233. Accordingly, Medina's statements to Detective Crisfield and his colleagues will not be suppressed on the grounds that the detectives' questioning of Medina during the second interview at the 47th Precinct violated *Miranda* and Medina's Fifth Amendment rights.

## IV. *REQUEST FOR COUNSEL*

Finally, Medina argues that the NYPD did not "scrupulously honor" his "clear requests for counsel" before questioning him on July 28, 2012. (Nov. 16, 2012 Def. Br. (Dkt. No. 43) at 28–30).

### A. *Legal Standard*

 "The Fifth Amendment provides that no person 'shall be compelled in any criminal case to be a witness against himself' ... [and] allows a person to express his desire ... to remain silent until he has the assistance of an attorney." *United States v. Okatan*, 728 F.3d 111, 116 (2d Cir.2013). "[A]n accused ... having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

 "For a suspect to invoke his *Miranda* right to counsel, he must at a minimum make 'some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney in dealing with custodial interrogation.'" *United States v. Oehne*, 698 F.3d 119, 122–23 (2d Cir.2012) (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 178, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991)) (emphasis omitted). "'If an accused

makes a statement concerning the right to counsel that is ambiguous or equivocal or makes no statement, the police are not required to end the interrogation, or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights.' " *Id.* at 123 (quoting *Berghuis v. Thompkins,* 560 U.S. 370, 381, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010)).

### B. *Analysis*

In his affidavit, Medina claims that he requested counsel repeatedly, both at the time of his arrest and at the 47th Precinct. The police officers who testified at the suppression hearing, however, all testified that Medina never requested counsel. The Court finds the testimony of these officers credible on this point. Moreover, Medina's assertions concerning his alleged requests for counsel are contradicted by his execution of the advice of rights form, in which he acknowledges being advised of his right to speak with counsel before answering any questions, and agrees to answer questions without the advice or presence of counsel. The Court concludes that Medina did not invoke his right to counsel.

### CONCLUSION

For the reasons stated above, Defendant Medina's motion to suppress is denied in its entirety. The Clerk of the Court is respectfully directed to terminate the motion (Dkt. No. 11).

SO ORDERED.